**UNITED STATES, Appellee,**

v.

**Larry R. LeMERE, Private First Class, U.S. Army, Appellant.**

No. 47133.
CM 442431.

U.S. Court of Military Appeals.

April 28, 1986.

For Appellant: *Captain Frank J. DiGiammarino* (argued); *Colonel William G. Eckhardt, Colonel R. Rex Brookshire, II, Major Robert M. Ott, Captain Peter L. Yee* (on brief); *Captain Joel R. Maillie* and *Captain John Lukjanowicz.*

For Appellee: *Captain Robert C. Erickson, Jr.* (argued); *Colonel James Kucera, Lieutenant Colonel John T. Edwards, Major Thomas J. LeClair, Captain Charles S. Arberg* (on brief); *Lieutenant Colonel Adrian J. Gravelle.*

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried by a general court-martial composed of officer members at Schofield Barracks, Hawaii, on February 26 and March 2–4, 1982. Contrary to his pleas, he was convicted of sodomy with a child under the age of 16, in violation of Article 125, Uniform Code of Military Justice, 10 U.S.C. § 925. The court-martial sentenced LeMere to a dishonorable discharge, confinement for 12 years, forfeiture of $450.00 pay per month for 144 months, and reduction to Private E-1. However, the convening authority approved the sentence except for confinement and forfeitures in excess of 6 years. The Court of Military Review affirmed the approved findings and sentence, 16 M.J. 682 (1983). Thereafter, we granted review to consider these issues:

I

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING MRS. NORMAN, THE ALLEGED VICTIM'S MOTHER, TO TESTIFY TO A STATEMENT MADE TO HER BY THE VICTIM THE MORNING AFTER THE ALLEGED OFFENSE.

II

WHETHER [IF THE ANSWER TO THE SPECIFIED ISSUE IS IN THE AFFIRMATIVE] THE ARMY COURT OF MILITARY REVIEW CORRECTLY CONCLUDED THAT THE ERRONEOUS ADMISSION OF HEARSAY EVIDENCE DIRECTLY IMPLICATING THE APPELLANT AS THE PERPETRATOR OF THE CHARGED OFFENSE WAS HARMLESS BEYOND A REASONABLE DOUBT.

I

A

Appellant and three others had been invited for a Christmas dinner party at the home of Sergeant Jeffrey Norman and his wife. LeMere arrived around mid-day; and, according to Mrs. Norman, from then on he "was playing ... all the time" with her three-and-a-half-year-old daughter Christy, and "he was always embracing her." "During the day I saw that he would play with her and he would give her little kisses. He would sit her in his lap—on his legs, and Christy would move away because she wanted to play with her toys and he would talk to her and Christy would say no."

About 6:00 p.m., after the other guests had departed, Mrs. Norman saw appellant go upstairs with Christy. She estimated that they had stayed there 3 to 4 minutes before appellant eventually brought her daughter back downstairs in his arms. He then sat beside Christy, and again they played together. Later, appellant and Christy went upstairs a second time. After 2 or 3 minutes, Mrs. Norman also went upstairs to her bedroom in order to get her husband an Alka-Seltzer. From her bedroom, she heard Christy's voice but could not determine what she was saying. However, when Mrs. Norman noticed that the door to her daughter's room was closed, she became alarmed because Christy never closed her bedroom door as she was afraid to be in a closed room. Mrs. Norman attempted unsuccessfully to open the door, which was locked from within. Having never known Christy to lock her door by herself, Mrs. Norman knocked on the door about three times.

According to Mrs. Norman, LeMere took at least 2 or 3 minutes to open the door. When he finally did so, she saw Christy lying in bed under a sheet. Her panties had been pulled above her slacks—with nearly half of the panties showing. Previously Mrs. Norman had never seen her daughter pull her panties up to the point where they were exposed far above the navel. LeMere "was near ... [her] bed"; and "[h]e was, like, nervous, astonished. He told me that Christy wanted to sleep." However, Mrs. Norman told him that it was not time for her daughter to go to bed; and she took Christy back downstairs to

watch television. Appellant then went back downstairs behind them.

At this time Mrs. Norman did not question her daughter about appellant's activities in the bedroom. However, she had admonished her husband that it was time to take appellant home. Before leaving, appellant took Christy upstairs to look for her shoes; but, at Mrs. Norman's insistence, her husband joined them in the search. After the shoes were found, the Normans drove appellant home. According to Mrs. Norman, while they were enroute to his house, "[t]he accused had ... [Christy] in his arms and he wanted to sit on the back seat of the car"; but she directed him to sit up front because he would be getting out first. During the ride Christy fell asleep in appellant's arms; and according to Mrs. Norman, she did not awaken until the next morning.

When Christy awoke, she also woke up her mother. According to Mrs. Norman, at that time she asked her daughter what "Larry"—appellant—had been doing in her bedroom with the door closed. In some combination of English and Spanish[1], Christy had responded, "Mommy, Larry puso su mouth in my cola" and then had said, "Mommy, Larry puso su boca on my cola." It was explained to the court members that "boca" referred to the tongue and "cola" to the vagina or anus. The court members heard Mrs. Norman testify at least four times about this discussion: On questioning by trial counsel, by defense counsel, again by trial counsel, and by the military judge. In connection therewith, she was allowed to explain that, when telling about appellant the next morning, Christy had pointed to her tongue and to her groin area in the front part of her body below the belt.

According to Mrs. Norman, when she had washed Christy that morning, she noticed that her vaginal area was "all red."

However, the night before Christmas, when she cleaned this area, she had not detected any redness. Even though on Christmas day Christy had urinated in her underclothes, Mrs. Norman did not believe that this would cause the redness because the clothes had quickly been changed. Mrs. Norman denied that Christy had any medical condition—such as heat or skin rashes—that would have caused the redness in the vaginal area; and she was not aware of any other possible cause of the skin discoloration.

However, Mrs. Norman acknowledged that on the morning she had spoken to Christy about appellant, she had inquired whether her daughter felt any pain and had received a negative answer. Moreover, Christy was not crying and did not appear at any time to have been upset. On the other hand, she had never before made a statement like the one about LeMere; and she had never exhibited any curiosity about sex. Although Sergeant Norman had copies of *Playboy* magazine which depicted acts of oral sodomy, they had always been kept in a bedroom closet completely out of Christy's reach. According to Mrs. Norman, although occasionally her daughter told small lies when playing with her friends, she had never told "big lies"; and Christy knew that, if she lied to her mother, she would be punished.

Sergeant Norman testified that Christy knew the difference between right and wrong, had a good memory, and could remember an impressive event that happened a month earlier. He gave this description of the lock on her bedroom door:

It has a little device that you can grasp it by which to turn it. You have to turn it clockwise to lock it but you have to push it in to turn it.

Christy was then sworn as a prosecution witness. In response to trial counsel's

---

**1.** Apparently, Mrs. Norman was a Hispanic and did not speak English very fluently; and her daughter conversed in mixed English and Spanish. Therefore, a translator was utilized during the court-martial. At times the defense objected to certain Spanish-to-English translation be-

cause the Spanish term or expression allegedly had more than one meaning. However, the military judge implored the defense not to object unless the disputed translation involved significant matters.

questions, she stated that she would be punished if she told a lie. She understood that she had to tell the truth in the courtroom; and she promised to tell the court exactly what happened. After considerable *voir dire* as to her competence as a witness, and over defense objection, Christy was allowed by the military judge to testify before the court members.

Her account was that LeMere—whom she identified as "Larry"—had come to her house on Christmas. He had taken her up to her room, where he put the "boca en mi cola"; and she identified "boca" as "tongue." Furthermore, using an anatomically correct doll, she indicated that appellant had pulled her panties down and had put his tongue into her vagina.

During cross-examination, Christy stated that trial defense counsel and the military judge had been at her home on Christmas and that three of the court members also were guests. According to her, she lived in a store and had seen trial counsel "go potty" at her home. Contradicting her mother's testimony, Christy stated that she could lock her bedroom door and that she had looked at some unidentified magazines that her father had in the bathroom. However, in response to the question by trial defense counsel, "Christy, did I put my boca on your cola?", she emphatically answered, "No, Larry." When asked if "anyone else" had their "boca on" her "cola," she again exclaimed, "No, Larry, Larry, Larry, no, not you, Larry." Her testimony concluded with some inconsistent responses as to who had told her what Larry did to her in the bedroom.

After the Government had rested its case, the defense called Sergeant Norman as its witness. He testified that magazines like *Penthouse* and *Playboy* had been in his home for about 2 years and he read some of them in the bathroom adjoining the master bedroom. He still insisted that these magazines were kept out of Christy's reach on a shelf in a closet in the bedroom and that he never left any of them lying around the house. Once appellant had been babysitter for his daughter; but a young girl who lived next door had sat with Christy on all other occasions.

LeMere testified in his own defense that he had taken Christy upstairs after she had asked him to take her to the bathroom to "pee pee"; but he had not gone into the bathroom with her. Instead, he had waited in the hallway. After she had finished, she said "toys, bedroom"; and he understood this to mean that she wanted to go into her bedroom to play with her toys. He went there and sat down on her bed, after which Christy followed him into the room, "shut the door and locked it," got on the bed and started rolling in the covers." During this time, he played with her doll; and the two of them also played hide-and-seek. When he heard someone knocking at the door, Christy was rolling in the covers; and he was standing by the fish bowl looking at the fish. LeMere "unlocked the door" in "[a]bout 5 seconds"; and then Mrs. Norman opened the door. Thereupon she asked him where was Christy; and he answered that "she was in the bed sleeping," even though his testimony had been that she was rolling in the covers when Mrs. Norman came to the door. Mrs. Norman then told Christy to go downstairs and watch television.

Appellant denied that the child's clothing was "in disarray" or that he had taken her "pants down" or touched "her vaginal or rectal area." Although he did not know the reason, appellant admitted that he was surprised when Mrs. Norman knocked on the door and that "he did not want Mrs. Norman to see Christy in bed." LeMere had initially testified that he had been in her bedroom approximately 10 minutes; but when he was again questioned by defense counsel after a recess, he claimed the period was considerably shorter. LeMere denied that he had wanted to sit in the back seat with Christy when the Normans were taking him home.

After the defense had rested, further testimony was heard at the request of the court members. Mrs. Norman testified that the redness on her daughter's vaginal area had lasted 3 days. Appellant testified

that he had not wanted Mrs. Norman to see Christy when she opened the door because he "was playing a game with" Mrs. Norman. Moreover, he claimed that he was surprised and nervous when he heard the knock on the door because he thought that someone was "[t]rying to do something to Christy." This concern was generated by a past experience when someone had tried to do something to his sister's children.

Finally, the members heard Christy's babysitter, a 12-year-old girl who lived next door, testify that she had never seen any magazines such as *Playboy* or *Penthouse* in the Normans' home; and she had never shown similar magazines to Christy.[2]

## B

After unsuccessfully moving *in limine* early in the trial to prevent Christy from testifying, the defense sought to exclude testimony about her extrajudicial statement to her mother. The defense view was that the statement was inadmissible hearsay; but trial counsel claimed that it was admissible as an exception to the hearsay rule under Mil.R.Evid. 803(1) or 803 (2) (present-sense-impression or excited-utterance exception, respectively), Manual for Courts-Martial, United States, 1969, paragraph 142*b* (Revised edition) (Change 5).

The military judge declined to rule on the admissibility of Christy's statement until Mrs. Norman revealed the circumstances under which it had been made. However, after she had so testified, trial counsel argued that the statement could be received either as an excited utterance under Mil.R. Evid. 803(2) or as a statement under the residual-hearsay exception in Mil.R.Evid. 803(24). He no longer contended that the statement was admissible as a statement of present sense impression.

Defense counsel replied that the statement could not be an excited utterance because the child was not excited or under any stress and, indeed, "was perfectly normal, not upset." Furthermore, Christy had not brought the matter to anyone's attention until 12 hours had passed; and even then, her statement was not volunteered but was made in response to specific questioning by her mother.

Trial counsel then argued that, if the statement was not an excited utterance under Mil.R.Evid. 803(2), it was admissible under the residual-hearsay exception because "the trustworthiness of the statement made by Christy ... is insured by the factual circumstances that were presented." However, the military judge was of the opinion that the statement could only be admitted under the residual-hearsay exception "if there's no other form of evidence that's as probative [so] you can [only] use that [exception] if the child were not available to testify." Because Christy was testifying in court, her statement could not qualify for admission under Mil.R.Evid. 803(24), the residual-hearsay exception.

As a fallback position trial counsel contended that Christy's statement was admissible because it was "an operative fact, that is, Mrs. Norman took certain actions based on this answer to the question that was given her." This, according to the prosecutor, was similar to the testimony of an investigator that he had "received a report of misconduct and" had taken certain action "thereafter based on the report." However, the military judge considered the child's statement "too inflammatory to" be admitted "under that theory."

Ultimately, the military judge ruled that the statement was admissible as an excited utterance under Mil.R.Evid. 803(2)

[b]ecause for a three and a half year old to make a statement like that strikes me

---

**2.** During a discussion as to whether the babysitter's testimony would be required, one member, Lieutenant Colonel Petersen, stated, "One of the biggest things to substantiate here, obviously, is the credibility of the child. The child's total lack of prior knowledge toward anything at all related to what the accusation is ..." At that point, the military judge interjected that this was "a crucial issue." Petersen then completed his sentence with the words "is a major part of what needs to be considered." A defense motion for a mistrial based on the military judge's comment was denied.

that she's very much under the influence of the event and it was—the answer was given in response to a non-suggestive question. So I'm going to let that in. And it was made within 12 to 14 hours of the alleged events.

On appeal, all the judges of the Court of Military Review panel agreed that Christy was competent to testify, even though "[h]er subsequent confusion of truth, falsity, reality, and fantasy suggest[ed] that the trial counsel's efforts thereby to impress upon ... [her] the duty to testify truthfully were not entirely effective." *United States v. LeMere, supra* at 686.[3] However, the majority of the court held that her extrajudicial statement to her mother was inadmissible as an excited utterance under Mil.R.Evid. 803(2) because there was no "startling event perceived as such by the" child and the statement was not contemporaneous with the event described. *Id.* at 687. Senior Judge Clause, concurring, concluded that the military judge had not abused his discretion in admitting Christy's statement as an excited utterance. *Id.* at 688. In his view, the admissibility requirements for an excited utterance should not be applied as stringently in a sex-abuse case involving a small child as in cases where the declarant was an adult.

Despite disagreement as to admissibility of Christy's extrajudicial statement, the Court of Military Review upheld the conviction. All three judges concluded that any error in admitting the statement was harmless because there was other overwhelming evidence to prove appellant's guilt beyond a reasonable doubt. *Id.* at 688, 689.

## II

### A

■ To overcome the defense hearsay objection, trial counsel had argued at one point that Christy's statement was not hearsay because it was an "operative fact"

which explained her mother's subsequent action. A similar contention was advanced and rejected in *United States v. Gaeta,* 14 M.J. 383, 389 (C.M.A.1983), where the Government contended that the contents of a report to an investigator were admissible because they accounted for his later action. We commented:

> Had Agent Hite contented himself with explaining that he went to room 102 upon information received, it may arguably not have been objectionable. *See Foster v. Commonwealth,* 209 Va. 297, 163 S.E.2d 565 (1968); *Hemphill v. Commonwealth,* 379 S.W.2d 223 (Ky.1964); *State v. Barnes,* 345 S.W.2d 130 (Mo. 1961). However, it was quite unnecessary to identify appellant by name and to associate a specific criminal activity with him merely for the purpose of explaining why Hite happened to be at the scene. Of course the difficulty is that, as a police officer becomes increasingly specific in testifying about his reasons for initiating an investigation, the trier of fact is more likely to consider the reports received by the officer for purposes other than merely to understand why the investigation was initiated. *United States v. Mancillas,* 580 F.2d 1301, 1309 (7th Cir.1978); *United States v. Gomez,* 529 F.2d 412, 416 (5th Cir.1976); *United States v. Rodriguez,* 524 F.2d 485, 486 (5th Cir.1975). In a similar circumstance, the Court of Appeals for the Seventh Circuit disapproved of such evidence, noting that "there was no suggestion here of any improper law enforcement purposes, and in any event the agents' reasons for investigation were most assuredly not something the Government had to prove to carry its burden." *United States v. Mancillas, supra* at 1310.

Likewise, in this case no need existed to admit the details of Christy's statement in order to explain later events—such as her mother's observation of her vaginal area.

---

3. In the court's view, Christy's confusion only affected the weight to be accorded her testimony, rather than its admissibility. *See* Mil.R. Evid. 601 and 603. We declined review of an issue concerning competence of this witness.

## B

Mil.R.Evid. 801(d) provides:

A statement is not hearsay if: (1) ... The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving the person.

In requiring that a prior inconsistent statement be "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition", this rule imposes limitations that are not constitutionally required by the sixth amendment right of confrontation. *See California v. Green,* 399 U.S. 149, 90 S.Ct.1930, 26 L.Ed.2d 489 (1970). There, a majority of the Supreme Court concluded that the confrontation clause did not preclude the California legislature from providing that "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing," *id.* at 150, 90 S.Ct. at 1931, and if the witness is "given an opportunity to explain or deny the prior statement at some point in the trial." *Id.* n. 1.

> The Court recognized that under
> [t]he orthodox view, adopted in most jurisdictions, ... out-of-court statements are inadmissible for the usual reasons that have led to the exclusion of hearsay statements: the statement may not have been made under oath; the declarant may not have been subjected to cross-examination when he made the statement; and the jury cannot observe the declarant's demeanor at the time he made the statement.... [U]nder this view, the [prior] statement may not be offered to show the truth of the matters asserted

therein, but can be introduced under appropriate limiting instructions to impeach the credibility of the witness who has changed his story at trial.

*Id.* at 154, 90 S.Ct. at 1932, 1933. California, however, has concluded—along with the courts of some jurisdictions and many legal commentators, *see, e.g., id.* at 154–55 nn. 5, 6, and 7, 90 S.Ct. at 1933 nn. 5, 6, and 7—that "the substantive use of prior inconsistent statements" should be authorized "on the theory that the usual dangers of hearsay are largely nonexistent where the witness testifies at trial. The whole purpose of the Hearsay rule has been already satisfied [because] the witness is present and subject to cross-examination [and] [t]here is ample opportunity to test him as to the basis for his former statement.'" 399 U.S. at 155, quoting 3 J. Wigmore, *Evidence* § 1018 (2d ed. 1940).

■ Although reception in evidence of Christy's statement to her mother would not have violated appellant's sixth-amendment rights, this, of course, is not decisive as to admissibility in a court-martial. The President in promulgating the Military Rules of Evidence was perfectly free to impose additional restrictions on the admissibility of prior extrajudicial statements—restrictions like those approved by Congress and the Federal Rules of Evidence and applied in many states, *see California v. Green, supra* at 154 n. 4, 90 S.Ct. at 1933 n. 4. Because the extrajudicial statement here was not "inconsistent," "under oath," or made in some "proceeding" or "deposition," it could not be admitted under Mil.R.Evid. 801(d)(1)(A).

## C

■ The military judge reasoned that Christy's statement to her mother was admissible under Mil.R.Evid. 803(2) as an excited utterance. Such an utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." We agree fully with the rejection of this rationale by the majority of the Court of Military Review. Pre-

sumably this exception under 803(2) is based on the assumption that persons are less likely to have concocted an untruthful statement when they are responding to the sudden stimulus of "a startling event." If that assumption is correct, then the event must be viewed as "startling" by the declarant, regardless of how it might appear to some other person. In this context, the incident in the bedroom involving appellant could hardly have been "startling" because Christy did not seem upset at the time, later went upstairs with appellant to look for her shoes, fell asleep in his arms as he held her when he was being driven home, and acted in a calm and normal manner at all times after the event.

Furthermore, when Christy made the statement to her mother, she clearly was no longer "under the stress of excitement." Indeed, if there had ever been any "excitement," the 12–hour lapse of time would seem to have removed its "stress." *Cf. United States v. Sandoval*, 18 M.J. 55 (C.M.A.1984) (Military Rules of Evidence inapplicable). Judge Clause apparently believed that for a small child excitement can continue much longer than for an adult. While conceivably this may be true, there is nothing to indicate that his theory applied to Christy, the declarant here.

Paragraph 142*b*, Manual, *supra,* contained a hearsay exception for "spontaneous exclamations." Perhaps "excited utterance"—the phrase used in the Military Rules of Evidence—does not require spontaneity; and in that event, there may be less relevance to precedents which distinguish statements given in response to questions from those given without prompting. *See, e.g., Ketcham v. State*, 240 Ind. 107, 162 N.E.2d 247, 249 (1959); *Smith v. United States*, 215 F.2d 682, 683 (D.C.Cir.1954). Nonetheless, we believe that Mil.R.Evid. 803(2) cannot readily be applied to a situation where a child calmly answers questions asked by her mother, instead of emotionally volunteering information.

### D

Mil.R.Evid. 803(24) and 804(b)(5) contain exceptions for residual hearsay.

Mil.R.Evid. 804(b)(5) does not apply here because it requires that the declarant be unavailable; and Christy was definitely available. Mil.R.Evid. 803(24) requires that the extrajudicial statement have "equivalent circumstantial guarantees of trustworthiness" to statements covered by the hearsay exceptions specified in Mil.R.Evid. 803(1) through 803(23). Another condition for admissibility under 803(24) is that the statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."

The military judge did not believe that this condition had been met because Christy herself was available as a witness; and apparently he resolved that her testimony would be "more probative" than an extrajudicial statement she had made at a prior time. This position gains support from the theory that to some extent the hearsay exceptions are based on necessity; and there is less necessity to receive an extrajudicial statement if the declarant is available to testify in court.

On the other hand, there are situations when a declarant's earlier statement may be more reliable than his current testimony. Indeed, this is the premise for admitting "recorded recollection" as an exception to the hearsay rule under Mil.R.Evid. 803(5). Moreover, if the draftsmen of Mil.R.Evid. 803(24) had believed that this rule would not apply in situations where the declarant was available to testify, it would have been hard to justify promulgating the rule because its very terms make the rule apply even if the declarant is available to testify.

We shall not seek at this time to resolve this quandary because in any event the residual hearsay exception should not be applied in a case like this where the military judge at the trial never made the determinations called for by Mil.R.Evid. 803(24).

### E

One other possibility for admission of Christy's statement comes to mind, al-

though it was not argued at trial or on appeal. A prior statement by a witness consistent with his testimony "is not hearsay if ... offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Mil.R.Evid. 801(d)(1)(B). This provision could not have been properly invoked when Mrs. Norman first testified about the statement because Christy had not yet testified. However, after she testified, the statement might have been admissible to rebut "an express or implied charge" by the defense if that "charge" had been made by cross-examination or by extrinsic evidence. Subject to Mil.R.Evid. 403—which balances "probative value" against "unfair prejudice, confusion of the issues," and other considerations—the criterion of admissibility then would be whether the defense was charging Christy with "recent fabrication" or was claiming that an "improper influence or motive" existed, such as an "influence" from her mother that she give a particular version of events.

Although this possible avenue for admissibility may have existed, it was never invoked by the Government in the trial or appeal of this case. Therefore, we shall not consider it any further, but instead shall turn to determining whether the court below was correct in its conclusion that any error was harmless.

### III

Because Christy testified as a witness, she was subject to cross-examination, and the court members could observe her demeanor and evaluate her credibility, memory, and ability to narrate the events accurately. Under these circumstances, the introduction of her extrajudicial statement does not present constitutional issues. In *California v. Green, supra,* the Supreme Court ruled that admission of a prior inconsistent statement by a prosecution witness did not violate the defendant's right of confrontation; and so we cannot see how introduction of a prior consistent statement could have this effect. In turn, if constitutional error is not involved, we are not compelled to apply the test which would be utilized in determining whether a constitutional error requires reversal— namely, whether the error was harmless beyond all reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Remai,* 19 M.J. 229 (C.M.A.1985).

In determining whether prejudicial error exists, we also believe it relevant that Christy's extrajudicial statement might have been admitted if it had been offered after she had testified in order to rebut a charge "of recent fabrication or improper influence or motive." If the error consisted of a mistake by the trial counsel in developing a sequence for the presentation of his evidence, then appellant deserves less solicitude than if the prosecution was using evidence which simply did not qualify for admission.

We realize that repetition of a witness' account of a transaction may help sway a trier of fact. However, some of the same factors that led the California legislature to broaden the admissibility of extrajudicial statements by a witness testifying at the trial and which, in turn, led the Supreme Court to sustain this legislation in *California v. Green, supra,* persuade us that appellant has not been prejudiced. Christy was subject to extensive cross-examination; and the cross-examiner was perfectly free to question her about the extrajudicial statement she had made to her mother. Her extrajudicial statement was made not by someone unknown to the trier of fact but instead by a person whose perception, recollection, and ability to communicate they had observed in the crucible of cross-examination. In light of these circumstances and the other prosecution evidence, we, too, are convinced that any error was harmless within the meaning of Article 59(a), UCMJ, 10 U.S.C. § 859(a).

### IV

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.