UNITED STATES, Appellee

v.

William J. FELTHAM, Operations Specialist Senior Chief
U.S. Navy, Appellant

No. 02-0879

Crim. App. No. 9900966

United States Court of Appeals for the Armed Forces

Argued April 9, 2003

Decided July 15, 2003

GIERKE, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., EFFRON, BAKER, and ERDMANN, JJ., joined.

Counsel

For Appellant:  Lieutenant Marcus N. Fulton, JAGC, USN (argued).

For Appellee:  Lieutenant Frank L. Gatto, JAGC, USNR
(argued);Colonel R. M. Favors, USMC (on brief); Lieutenant
Adrienne N. Gagliardo, JAGC, USNR.

Military Judge:  Clark A. Price

**This opinion is subject to editorial correction before final publication**.

Judge GIERKE delivered the opinion of the Court.

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of forcible sodomy, in violation of Article 125, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 925 (2000). The adjudged and approved sentence provides for a bad conduct discharge, reduction to the lowest enlisted grade, and confinement for four years. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion. United States v. Feltham, NMCM No. 9900966 (N-M. Ct. Crim. App. June 14, 2002).

This Court granted review of the following issue:

> WHETHER THE LOWER COURT ERRED IN RULING THAT THE
> MILITARY JUDGE DID NOT ABUSE HIS DISCRETION IN
> ADMITTING THE VICTIM'S INCULPATORY STATEMENTS TO HIS
> ROOMMATE UNDER THE EXCITED UTTERANCE EXCEPTION TO THE
> RULE AGAINST HEARSAY.

For the reasons set out below, we affirm the decision of the Court of Criminal Appeals.

## Factual Background

Appellant was convicted of committing forcible sodomy on Boatswain Mate Third Class Petty Officer (BM3) PW. BM3 PW was 24 years old, attached to the USS NIMITZ for approximately three to four years, and assigned to the Security/Legal Department. Appellant, a shipmate of BM3 PW's, was a 35 year-old Operations Specialist Senior Chief Petty Officer with 17 years of naval service.

On May 5, 1998, the NIMITZ was berthed in Norfolk, Virginia, awaiting overhaul. After a full day's work, BM3 PW, Appellant, and several shipmates agreed to go ashore that evening to a local

bar to celebrate their completion of the preparation for overhaul.

BM3 PW drove alone in his truck to the bar, arrived there at approximately 7:00 or 7:30 p.m., played pool, and drank "no more than five beers probably." He then left the bar and went back to his barracks to get more money, returned after 9:00 p.m. and drank more beer. During the course of the evening, BM3 PW played darts, sang karaoke, and engaged in conversation with Appellant and other shipmates.

At some point in the evening, because he was too intoxicated to drive, apprehensive about leaving his truck in an unfamiliar area, and concerned about getting to work the following day, BM3 PW gave his truck keys to a civilian whom he had met at the bar. The civilian lived next door to the bar and told him he could stay at his house and sleep on the couch.

As the bar was closing on the morning of May 6, the civilian approached BM3 PW and informed him that Appellant had his truck keys and that he could stay at Appellant's apartment instead. BM3 PW testified that "by this time, I just said all right, fine. You know, I agreed with him 'cause I wasn't leaving my truck there, you know, what I'm saying. At least, my truck was going with me. So, I agreed with him. I'm like, okay, fine."

When the two arrived at Appellant's local apartment, Appellant offered to share his bed with BM3 PW. Appellant told BM3 PW he could sleep on one side of his bed and Appellant could sleep on the other side. BM3 PW laughed, declined his offer, and stated he would instead sleep on the couch. Appellant gave BM3 PW a blanket and pillow and escorted him to the living room.

Appellant returned to his bedroom.  BM3 PW undressed down to his socks, tee-shirt, and briefs.

Shortly after BM3 PW reclined on the couch in the living room, Appellant came out of his bedroom wearing a bathrobe. Appellant and BM3 PW went out on the balcony and each smoked a cigarette.  While on the balcony, they engaged in conversation but did not talk about anything sexual.

After smoking the cigarette, BM3 PW again reclined on the couch under the blanket and fell asleep.  At the time BM3 PW went to sleep, he had been awake since approximately 4:00 a.m. in the morning on May 5.  He had worked a full day aboard the ship, and after work he had consumed approximately 12-15 beers over a period of six to seven hours at the bar.

BM3 PW testified as follows regarding the events at Appellant's apartment that resulted in the charge against Appellant of forcible sodomy:

```
Q.  What is the next thing you remember after laying
    down on the couch and going to sleep?
A.  The next thing I remember, after I fell asleep,
    I remember having a dream -- sexual content.  I
    don't remember the dream specifics, but I
    remember having a sexual dream, yes.

Q.  When you went to sleep, were you under the
    blanket?
A.  Yes, Sir.

Q.  And you said you had a sexual dream, but you
    don't remember the content of it?
A.  No, Sir.

Q.  So, how do you know it was sexual?
A.  'Cause I was having sexual pleasures in my dream.
    I mean, I know it was sexual like a wet dream.
    Like if you was having a wet dream, it was the
    same kind of -- same thing.  Wet dream, that's
    what I was having.
```

Q. So, what is the next thing you remember after
   the dream?
A. The next thing I remember, I remember ejaculating
   and waking up at the same time, and I woke up as
   I was ejaculating actually into Senior Chief
   Feltham's mouth.

Q. So, when you woke up, you were ejaculating?
A. Yes, Sir.

Q. Where was Senior Chief Feltham at that time?
A. He was on his knees next to the couch.

Q. And how were you positioned on the couch?
A. I was like kind of laying on my back and side
   like kind of on my back I would say.

Q. Was the blanket still on you?
A. I don't remember the position of the blanket,
   but, no, the blanket was not covering me, no.

Q. And where were your undershorts at the time?
A. Around my thighs.

Q. Now, while this -- do you remember having your
   pants pulled down?
A. No, Sir.

Q. Do you remember Senior Chief placing his mouth on
   your penis?
A. No, Sir.

Q. At any point prior to ejaculation, were you
   awake and aware of what was happening?
A. No, Sir.

Q. What was your reaction when you woke up and found
   Senior Chief Feltham's mouth on your penis?
A. Well, I pulled back and, when he realized that I
   was awake and pulled back, he jumped back and
   kind of scooted backwards and sat down on his
   chair.

BM3 PW then asked Appellant "what's going on here" and said "that wasn't cool." Appellant agreed that "it was messed up," but asked him if he liked it. BM3 PW testified, "I was scared. Confused because I didn't really know what that -- you know, what to think. I wasn't thinking too clearly about, you know, I was trying to make sense of it all basically." In response to being

asked by trial counsel if he was "shocked by waking up with [Appellant's] mouth on [his] penis," BM3 PW stated, "Yes, Sir."

Appellant then left the living room and returned to his bedroom. BM3 PW decided to wait for Appellant to fall asleep. BM3 PW testified:

> I didn't know what to do, and I was still in shock, of course, and so at that point I guess I decided to wait until he fell asleep. Don't ask me why, but I felt like maybe I had better chances of getting out of there without physical harm done. So I decided to wait until he went to sleep."

Nonetheless, BM3 PW left within five minutes.

After leaving Appellant's apartment, BM3 PW climbed into his truck, became upset, and began to cry. At trial, BM3 PW testified that he became upset at this point because he "was out of the situation." He then drove between 10-15 minutes back to his barracks. BM3 PW arrived and went directly to his room. He testified that he was still shocked, scared, crying and upset. BM3 PW woke up his roommate, BM3 Felton. BM3 Felton was the first person that he had the opportunity to speak with after the incident at Appellant's apartment. BM3 PW told BM3 Felton everything that had happened, beginning with the party at the bar and ending with the sodomy.

BM3 PW next went to a nearby convenience store. When he returned, he called his mother and informed her of the incident. BM3 PW then reported the incident to Wackenhut Security, a private security company working in his barracks, which referred him to Petty Officer (PO) Battles, who was on watch. PO Battles referred BM3 PW to Master at Arms Third Class Petty Officer (MA3) Allen. MA3 Allen obtained a written statement concerning the incident. BM3 PW then spoke with Special Agent (SA) Suchy of the

Naval Criminal Investigative Service.  BM3 PW did not testify as to what he specifically told his mother, Wackenhut Security, PO Battles, MA3 Allen, or SA Suchy.  His testimony concerning his discussions with these individuals was offered for the limited purpose of showing to whom he reported the incident.

BM3 PW's reporting of this incident resulted in Appellant being charged with several offenses, but the trial on the merits eventually proceeded on the single offense of forcible sodomy. At trial, the defense unsuccessfully moved to suppress Appellant's oral and written confession of consensual sodomy. After the judge denied the defense motion, the prosecution, for reasons not reflected in the record of trial, never offered Appellant's confession into evidence.  This trial development resulted in the testimony of BM3 PW being the linchpin of the prosecution's case.

At trial, the defense presented no opening statement, no defense witnesses, and no defense evidence on the merits. Instead, the defense attacked the credibility of BM3 PW and in closing argument asserted multiple defenses including that no sodomy occurred or that it was consensual.  To bolster the credibility of BM3 PW, the prosecution submitted a motion in limine to admit BM3 PW's statements to BM3 Felton as an excited utterance or alternatively under the residual hearsay exception. The military judge deferred ruling on the admissibility of the evidence until after hearing the testimony.  BM3 Felton's testimony essentially corroborated the facts described by BM3 PW. BM3 Felton also stated that he had lived with BM3 PW for approximately one and a half months.  He testified that BM3 PW

was crying and that he did not stop crying until "about half way" through their twenty minute conversation.

After considering the circumstances surrounding BM3 PW's statements to BM3 Felton, as set out above, the military judge made the following findings of fact pertinent to the resolution of the issue presented:

> Early on the morning of 6 May, BM3 [PW] was a participant in a startling event at the apartment of the accused.
>
> Immediately after the incident he was in a state of shock and was not thinking clearly.
>
> Shortly thereafter, he left the apartment and drove to his barracks room at Huntington Hall where he resided.
>
> During the short drive to his barracks, he began crying.
>
> Upon entering his room, he woke up his roommate, BM3 Felton, and told him he had something to tell [BM3] Felton.
>
> BM3 [PW] was still crying at this point.
>
> He then told Felton he would not tell him about this matter unless Felton promised not to share it with anyone else, or words to that effect.
>
> No more than one hour passed from the time of the startling event until the conversation with . . . BM3 Felton.
>
> . . . .
>
> BM3 [PW] then related to BM3 Felton what happened to him that night.
>
> This was a highly unusual conversation for these two roommates who had known each other for some time.
>
> BM3 Felton had never seen BM3 [PW] this way before.

The court, based on these factual findings, ruled as follows:

> The proffered statements to BM3 Felton were spontaneous, unrehearsed and not given in response to any interrogation.  The statements were given in

8

> close proximity of time to a startling event which
> caused great stress and excitement in BM3 [PW]. The
> statements were made under that same stress. The
> statements are, therefore, reliable under the excited
> utterance exception to the general hearsay rule.

The military judge chose not to address the residual hearsay exception since he admitted the testimony under the excited utterance exception to the hearsay rule.

The Court of Criminal Appeals addressed the legal and factual sufficiency of the evidence and the excited utterance issue raised by Appellant. The Court found that the military judge did not abuse his discretion in admitting the statements by BM3 PW to BM3 Felton. In doing so, the Court stated, "Given the victim's countenance, the timing of his unsolicited disclosure, and the subject matter of the disclosure, we have no doubt that the victim's statement to his roommate met the requirements for an excited utterance." Feltham, NMCM No. 9900966, slip op. at 4.

Before this Court, Appellant again asserts that the military judge erred in admitting BM3 PW's statements to BM3 Felton under the excited utterance exception to the hearsay rule, because the conversation with BM3 Felton was the product of a period of reflection following the stress related to the incident. The Government argues that the judge did not abuse his discretion by admitting the evidence because the testimony at trial established that BM3 PW made his statements to BM3 Felton while under the stress of a startling event which occurred at Appellant's apartment.

## Discussion

Military Rule of Evidence 802 [hereinafter M.R.E.] states the general prohibition against admission of hearsay.  M.R.E. 801(c) defines hearsay as:

> [A] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

M.R.E. 803(2), the excited utterance exception to the rule prohibiting hearsay, permits admission of:

> A statement relating to a startling event or condition made while the declarant was under the stress of excitement cause[d] by the event or condition.

The Supreme Court recently reaffirmed the reliability of the longstanding and well recognized excited utterance exception to hearsay in Lilly v. Virginia, 527 U.S. 116 (1999), stating that,

> In White, . . . we held that the hearsay exception for spontaneous declarations is firmly rooted because it "is at least two centuries old," currently "widely accepted among the States," and carries "substantial guarantees of . . . trustworthiness . . . [that] cannot be recaptured even by later in-court testimony."  502 U.S. at 355-356, and n. 8.

Id. at 126 (quoting White v. Illinois), 502 U.S. 346, 355-56 & n.8.

This Court, in United States v. Arnold, 25 M.J. 129 (C.M.A. 1987), articulated a three-prong test for a statement to qualify as an excited utterance:

(1)  the statement must be spontaneous, excited, or impulsive rather than the product of reflection and deliberation;

(2)  the event prompting the utterance must be startling, and;

(3)  the declarant must be under the stress of excitement caused by the event.

Id. at 132.  See United States v. Donaldson, ___ M.J.___
(C.A.A.F. 2003).

The theory underlying the admission of an excited utterance
is "that persons are less likely to have concocted an untruthful
statement when they are responding to the sudden stimulus of a
'startling event.'"  United States v. Lemere, 22 M.J. 61, 68
(C.M.A. 1986).  This Court has recognized that the implicit
logical premise for admission of an excited utterance is "that a
person who reacts 'to a startling event or condition' while
'under the stress of excitement caused' thereby will speak
truthfully because of a lack of opportunity to fabricate."
United States v. Jones, 30 M.J. 127, 129 (C.M.A. 1990).

At Appellant's court-martial, the military judge applied the
three-prong test in Arnold and concluded that the facts supported
admitting the statements under the excited utterance exception to
the rule against hearsay.  The standard of review of a military
judge's ruling admitting or excluding an excited utterance is an
abuse of discretion.  See United States v. Moolick, 53 M.J. 174
(C.A.A.F. 2000).  This Court "will reverse for an abuse of
discretion if the military judge's findings of fact are clearly
erroneous or if his decision is influenced by an erroneous view
of the law."  United States v. Sullivan, 42 M.J. 360, 363
(C.A.A.F. 1995).  When reviewing a decision of a Court of
Criminal Appeals on a military judge's discretionary ruling, "we
typically have pierced through that intermediate level" and
examined the military judge's ruling.  See United States v.
Siroky, 44 M.J. 394, 399 (C.A.A.F. 1996).  We then decide whether

the Court of Criminal Appeals was correct in its examination of the military judge's ruling.

In applying the first prong of the test, which requires the statements to be spontaneous, excited, or impulsive rather than the product of reflection, the military judge found that BM3 PW's statements to BM3 Felton were "spontaneous, unrehearsed, and not given in response to any interrogation." The statements were made under the stress of the excitement stemming from the forcible sodomy while BM3 PW "was in a state of shock and was not thinking clearly." There was "no intervening reflection or dispassionate deliberation" by BM3 PW.

As to the second prong of the test, the military judge found that the statement was the product of a startling event. Specifically, the judge said that "[e]arly on the morning of 6 May, BM3 [PW] was a participant in a startling event at the apartment of the accused."

The third prong of the test, which requires the declarant to be under the stress of excitement caused by the event, was also satisfied. The military judge found that BM3 PW was in a state of shock and not thinking clearly immediately after the event and that he began crying while driving back to his barracks. The judge specifically stated that BM3 PW was still under the stress and excitement of the event when he described the event to BM3 Felton. He found "that no more than one hour passed from the time of the startling event until the conversation with . . . BM3 Felton." He also stated that "[t]he statements were given in close proximity of time to a startling event which caused great stress and excitement in BM3 [PW]."

This Court has stated that the time between the startling event and the excited utterance is one factor to consider when determining whether a statement qualifies as an excited utterance.  See Donaldson, ___ M.J. at ___ (statement made 11-12 hours after sexual abuse admissible as excited utterance); United States v. Chandler, 39 M.J. 119 (C.M.A. 1993)(victim's statement made 30 minutes after startling event was admissible as an excited utterance because victim was still in a state of nervous excitement as a result of the event); Arnold, 25 M.J. at 132 (victim's "unsolicited" statements, given 12 hours after being sexually assaulted, were made at the first available opportunity while the victim's demeanor was substantially different than normal and constituted an excited utterance).

However, this Court has also stated that "a lapse of time between the event and the utterance creates a strong presumption against admissibility."  Jones, 30 M.J. at  128.  In Jones, the Court held that a statement was not an excited utterance when made 12 hours after the startling event, after the declarant went about daily business, after missing an earlier opportunity to comment about the event, and when made in response to a question. Appellant's reliance on Jones is misplaced.  The military judge's ruling in the present case is consistent with the authority of Jones because here there was less than one hour lapse of time between the startling event and the utterance as opposed to 12 hours in Jones; BM3 PW made his statements at the first opportunity, when he awoke BM3 Felton, rather than waiting until morning; and the statements to BM3 Felton were not in response to questioning by BM3 Felton.

13

Moreover, the lapse of any particular period of time, is not the focus of the excited utterance rule. The critical determination is whether the declarant was under the stress or excitement caused by the startling event. See Lemere, 22 M.J. at 68. In the present case, the military judge made a finding that the declarant, BM3 PW, was under the stress of the excitement caused by the forcible sodomy performed on him by Appellant. This satisfies the third prong of the test.

We hold that the findings of fact of the military judge are supported by the evidence and that he did not abuse his discretion in admitting BM3 PW's statements to BM3 Felton as an excited utterance. The military judge applied the proper legal test to evaluate these statements and, after hearing and evaluating the evidence, determined that the facts satisfied the test. We hold that the Court of Criminal Appeals did not err in affirming the decision of the military judge admitting this evidence.

## Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.