**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Airman First Class ELLWOOD T. BOWEN**
**United States Air Force**

**ACM 38616**

**26 October 2015**

Sentence adjudged 8 March 2014 by GCM convened at Edwards Air Force Base, California.  Military Judge:  Lyndell M. Powell.

Approved Sentence:  Confinement for 1 year and reduction to E-1.

Appellate Counsel for the Appellant:  Captain Johnathan D. Legg.

Appellate Counsel for the United States:  Major Meredith L. Steer; Major Thomas J. Alford; and Gerald R. Bruce, Esquire.

Before

SANTORO, BROWN, and ZIMMERMAN
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

SANTORO, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of aggravated assault upon his wife and one specification of assault consummated by a battery upon a fellow Airman, in violation of Article 128, UCMJ, 10 U.S.C. § 928.[1]  The adjudged and approved sentence consisted of confinement for 1 year and reduction to E-1.  Before us, Appellant asserts that (1) the

---

[1] Appellant was found not guilty of two specifications alleging assault with a dangerous weapon (a knife) against his wife and the same fellow Airman, one specification alleging assault consummated by a battery upon his wife, and one specification of communicating a threat, in violation of Articles 128 and 134, UCMJ, 10 U.S.C. §§ 928, 934.

military judge erred by admitting testimony that Appellant's wife nodded her head when asked whether Appellant had "done this" to her, and (2) the evidence is factually insufficient to sustain the findings of guilt. We disagree and affirm.

*Background*

Appellant, his wife (MB), and Senior Airman (SrA) BB were friends and had socialized as a group on four to five occasions. On the night that gave rise to the charges in this court-martial, the three met at Appellant's home and drove together to an "anything but clothes" party. SrA BB wore a green bed sheet draped over his body like a toga while MB wore a bra top with playing cards attached.

All three drank and played drinking games at the party. During the evening Appellant became sick and vomited. When the trio was ready to leave the party, two other guests had to help SrA BB carry Appellant out and bring him back to his residence. Appellant, MB, and SrA BB remained overnight at Appellant's home.

What happened in the hours after the three returned to Appellant's home was the focus of the trial.

Around 0600, SrA BB walked into the Security Forces office and reported that there was a woman being assaulted in an ongoing "domestic" involving a knife. The Security Forces member to whom SrA BB spoke found his demeanor unusual, believing that his behavior did not match the serious nature of the report he was making. SrA BB did not appear to be intoxicated, had some scratches on his face, and his hands appeared to have been recently washed.

SrA BB told Security Forces that he and MB had been "taking shots" and then they went to sleep in the guest bedroom. He reported that he was awakened by Appellant beating MB in that same guest bedroom. SrA BB told investigators that nothing had happened between him and MB and that he did not know why Appellant was assaulting his wife.

As SrA BB was giving his initial statement to law enforcement, other Security Forces members responded to the house. They knocked on the door, and Appellant answered. He appeared disoriented and was wearing a pair of sweatpants and socks but no shirt. There was what appeared to be water and blood in the entryway. Technical Sergeant (TSgt) VC, the Security Forces flight chief, inspected the remainder of the house. In the master bedroom she found blood on the sheets.

MB was unconscious in the tub in the master bathroom. Her head was leaning against the faucet and her hair was covering her face. Her eyes were swollen and there was a gash over one eye. Although TSgt VC initially thought MB was dead, she realized

she was alive when MB groaned. TSgt VC and another Security Forces member lifted MB out of the bathtub and placed her on the bed. MB's eyes remained closed and she was only partially conscious. One of the other Security Forces responders asked MB whether her husband "did this to her." MB shook her head up and down, which TSgt VC interpreted as an affirmative response. TSgt VC instructed her personnel to apprehend Appellant.

Law enforcement processed the scene, making observations and collecting evidence. In the guest bedroom they found a pair of women's black pants on the floor with panties inside them, along with a black bra with playing cards attached. TSgt VC testified that the appearance of the pants and panties suggested that they had been removed at the same time. There was a feminine napkin inside the panties. There was a colored sheet and what appeared to be men's black socks on the floor.

Additional physical evidence included red marks (apparent blood) on the couch in the living room and a knife beside the television. In the kitchen, which was generally in disarray, were another knife, scissors, a blue woman's nightie, and a bottle of alcohol with two glasses. There was also vomit on the side of a car in front of the residence.

When TSgt VC called the Security Forces office and learned that SrA BB had arrived without socks, she directed that he also be apprehended. Following a rights advisement, SrA BB told investigators that when they returned from the party, he assisted Appellant to the couch, put a blanket over him, and began taking shots with MB. When they had finished drinking, SrA BB went to the guest room to sleep. He was awakened by loud moans and yells and Appellant beating his wife in that same guest bedroom. SrA BB denied having had any sexual contact with MB—a subject investigators had not yet raised.

Later that day, Air Force Office of Special Investigations (AFOSI) investigators informed SrA BB that he was suspected of having sexually assaulted MB. SrA BB then changed his initial statements about what had occurred. He told investigators that MB came onto him, kissed him and fondled him in the kitchen when they were drinking, and then led him to the guest bedroom and locked the door. He said that MB took her clothes off and pulled him onto her.

SrA BB testified under a grant of immunity. His trial testimony was generally consistent with his second statement to investigators in which he admitted engaging in sexual contact with MB. SrA BB characterized Appellant as "wasted" and so intoxicated that he urinated and possibly vomited in a bush. They returned home from the party between 2400 and 0200. In the guest bedroom, when he was digitally penetrating MB, SrA BB heard Appellant bang on the door, demanding that they open it and asking why his wife was in the bedroom with SrA BB. Upon hearing Appellant, both MB and SrA BB separated and pulled the sheets up to cover themselves.

3

Appellant "busted through the door," pulled the blanket off MB, and saw that she was naked. When Appellant pulled the entire blanket off, he saw that SrA BB was also naked and asked his wife why she was in bed with SrA BB.

According to SrA BB, Appellant became angry and threw MB out of the guest bedroom toward the front door. She struck a table. SrA BB tried to get Appellant to stop and denied that he had done anything with his wife. Appellant then struck SrA BB several times in the living room; SrA BB struck back and a scuffle ensued. The fight moved into the kitchen. Appellant alternated between fighting with SrA BB and telling MB to wake up (at one point throwing water on her face); she remained unresponsive.

Appellant then grabbed a knife, slapped SrA BB with the flat side, and threatened to kill him. He also slapped MB with the knife, eliciting a painful yell. Appellant "dug the knife up against" SrA BB and threatened to kill him. SrA BB then put on his clothes and ran out of the house yelling for help and drove straight to Security Forces.

SrA BB conceded that MB had never shown any sexual or romantic interest in him before that night or flirted with him at the party. He also never mentioned the presence of a feminine napkin in MB's panties or the possibility that she was menstruating when he digitally penetrated her.

Appellant's neighbors testified that they heard a "loud boom" around 0600 and then heard MB scream in "tremendous pain" from the bathroom/bedroom area of Appellant's house. The neighbors further testified they heard screams for help, the sound of bath water running, and a male whom they believed was Appellant saying, "[W]hy are you naked in the front bedroom?"

MB also testified at trial, although she professed no memory of the assault itself. She said that when the three of them returned to her home after the party, she went into the kitchen and "took a shot." Her next memory is of Appellant and SrA BB fighting. She remembered Appellant saying, "what . . . did you do to her?" She got up, started to walk, felt dizzy, and fell. She next remembered being in the shower and feeling cold. She testified that she thought her husband was doing for her as he normally did when she became intoxicated: giving her a bath and putting her to bed.

As a result of the assault, MB suffered a subdural hematoma and a traumatic brain injury, 70 percent visual loss, the loss of smell, and other lesser physical injuries. As part of her medical treatment, a craniotomy was performed to reduce swelling on her brain.

Additional facts necessary to resolve the assignments of error are included below.

*Admission of Evidence*

Arriving law enforcement found MB in the bathtub with obvious injuries. As they removed her from the tub, one of the first responders asked whether her husband "did this" to her. MB groaned and shook her head up and down, indicating "yes." Over defense objection, the military judge admitted this evidence as an excited utterance pursuant to Mil. R. Evid. 803(2).

We review a military judge's admission of evidence for an abuse of discretion. *United States v. McCollum*, 58 M.J. 323, 335 (C.A.A.F. 2003). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000). "[O]n a mixed question of law and fact . . . a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995). At trial, the proponent has the burden of establishing an adequate evidentiary foundation. *United States v. Maxwell*, 38 M.J. 148, 150 (C.M.A. 1993). This burden can be met with direct or circumstantial evidence. *Id*. at 150–51.

Both at trial and on appeal, Appellant argues that admission of this evidence violated his Sixth Amendment[2] right to confront the witnesses against him. MB testified that she had no recollection of having nodded her head and that based on her mental state at the time, she did not believe she could have made a reliable statement. Therefore, Appellant argues, he could not meaningfully cross-examine her on a statement that she did not recall making.

In *United States v. Rhodes*, 61 M.J. 445 (C.A.A.F. 2005), a witness made a pretrial statement implicating both himself and Rhodes in drug offenses. *Id*. at 446–47. At trial, however, the witness testified that he had no recollection of making that statement. *Id*. at 447. The government instead introduced the witness's pretrial statement through a law enforcement officer as a statement against interest pursuant to Mil. R. Evid. 804(b)(3). *Id*. Our superior court held that the Sixth Amendment's Confrontation Clause was not violated because the witness took the stand and was subject to cross-examination on matters such as bias and ability to observe and recall accurately, despite his purported inability to recollect having made the statement. *Id.* at 449 (citing *United States v. Owens*, 484 U.S. 554 (1988)).

We see no meaningful distinction between *Rhodes* and the facts of this case. We therefore conclude that the admission of testimony concerning MB's head-nod did not violate Appellant's Sixth Amendment right to confront the witnesses against him.

---

[2] U.S. CONST. amend. VI.

We next consider whether the evidence was properly admitted as an excited utterance. The parties do not dispute that the head-nod qualifies as a hearsay statement.[3] Appellant contends, however, that the Government failed to establish the necessary evidentiary foundation to qualify as an excited utterance.

Military Rule of Evidence 803(2) allows admission of a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Excited utterances have long been admissible as an exception to the rule against hearsay on the assumption "that persons are less likely to have concocted an untruthful statement when they are responding to the sudden stimulus of a 'startling event.'" *United States v. Feltham*, 58 M.J. 470, 474 (C.A.A.F. 2003) (quoting *United States v. Lemere*, 22 M.J. 61, 68 (C.M.A. 1986)). In *United States v. Arnold*, 25 M.J. 129 (C.M.A. 1987), our superior court established a three-prong test for the admissibility of excited utterances:

> "(1) the statement must be spontaneous, excited, or impulsive rather than the product of reflection and deliberation;
> (2) the event prompting the utterance must be startling, and;
> (3) the declarant must be under the stress of excitement caused by the event."

*Feltham*, 58 M.J. at 474 (citing *United States v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987); *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003)).

In allowing the evidence, the military judge stated:

> The court notes that there's been testimony from the neighbors who heard screaming from a female in that vicinity of the house only a few moments before law enforcement showed up. I think although Ms. [MB] is in no position to testify about her own mental state at the time and, certainly, was in no physical condition to manifest outward expressions of excitement, I think the fact that there were screams heard, shouting and banging heard in the bathroom only a few moments before, combined with Ms. [MB]'s physical condition when law enforcement arrived, I think it's reasonable.
>
> . . . .

---

[3] "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion. Mil. R. Evid. 801(a). "Hearsay" is a statement that the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement. Mil. R. Evid. 801(c).

The court finds that a startling or stressful event occurred. And, again, the court references regardless of when some of the assault occurred on Ms. [MB], as the court noted previously the next door neighbors heard screaming and a female voice yelling stop, along with yelling from a male voice only minutes before. The court finds that that would be a startling stressful event for the person who is conducting the screaming. The declarant, that is Ms. [MB], despite the fact that she doesn't currently recall the incident, certainly she testified that she remembered being confused. And, certainly, from the testimony of the neighbors indicating that the female was screaming out in pain the court concludes that the declarant would have had personal knowledge, at least to the fact that she was in pain and suffering from severe injuries.

The military judge's findings of fact were amply supported by the record and are not clearly erroneous. The military judge also conducted the balancing test required by Mil. R. Evid. 403 and placed his analysis on the record.

Appellant argues that the "head-nod" was not sufficiently contemporaneous with the assault, that the law enforcement officer's question was vague, and that Ms. MB's injuries might have made her head-nod less reliable. Based upon his factual findings, it was not an abuse of discretion for the military judge to conclude that MB's head-nod qualified as an excited utterance.

*Factual Sufficiency*

Appellant next argues that SrA BB's testimony was not credible, and, as a result, the evidence is factually insufficient to sustain the convictions. We review issues of legal and factual sufficiency de novo. *See United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A. 1987)). Proof beyond a reasonable doubt does not mean that the evidence must be free of conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of

7

guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

Appellant both attacks SrA BB's credibility and offers an alternate theory regarding the source of MB's injuries. We acknowledge that SrA BB had a motive to conceal the true nature of his interaction with MB, that he was not completely truthful in his initial statement to law enforcement, and that his estimates of time appear to be inconsistent with other evidence. Appellant's proffered alternate theory—that Appellant caught SrA BB sexually assaulting his wife and that all her injuries resulted from that sexual assault—has even less evidentiary support. Viewing the record as a whole, we conclude that SrA BB's testimony was generally credible and supported by other testimony and physical evidence and that the weight of the evidence establishes that Appellant was the cause of both MB's and SrA BB's injuries.

We have considered the evidence in the light most favorable to the prosecution. We have also made allowances for not having personally observed the witnesses. Having paid particular attention to the matters raised by Appellant, we find the evidence legally sufficient to support the conviction. Moreover, we are ourselves convinced of his guilt beyond a reasonable doubt.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.[4]

FOR THE COURT

STEVEN LUCAS
Clerk of the Court

---

[4] We direct promulgation of a corrected court-martial order to address the following errors: (1) the order incorrectly states that appellate review would be conducted pursuant to Article 69(a), UCMJ, 10 U.S.C. § 869(a); (2) Specifications 3 and 4 of Charge I fail to reflect not guilty findings with respect to language excepted by the members; and (3) the order added the title "Ms." in Specification 5 of Charge I, which did not appear on the charge sheet.