# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KRIMBILL, BURTON, and ARGUELLES[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Captain MARTIN JIMENEZ-CONTRERAS**
**United States Army, Appellant**

ARMY 20190030

Headquarters, Fort Bliss
Michael J. Hargis and Fansu Ku, Military Judges
Colonel Charles C. Poché, Staff Judge Advocate

For Appellant: Captain Thomas J. Travers, JA; William E. Cassara, Esquire (on brief and reply brief).

For Appellee: Colonel Steven P. Haight, JA; Lieutenant Colonel Wayne H. Williams, JA; Major Jonathan S. Reiner, JA; Lieutenant Colonel Teresa T. Phelps, JA (on brief).

13 November 2020

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ARGUELLES, Judge:

An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas,[2] of one specification of sexual assault, in violation of Article

---

[1] Judge Arguelles decided this case while on active duty.

[2] On two occasions prior to opening statements, and without objection, the military judge informed the members that appellant previously pleaded not guilty to The Charge and its Specifications. Having reviewed the record, it appears appellant never formally entered his pleas. This was error; however, given appellant's clear intent to plead not guilty and contest all of the offenses, we can conceive of no

(continued . . .)

120, Uniform Code of Military Justice, 10 U.S.C. § 920 (2012) [UCMJ].[3] The convening authority approved the adjudged sentence of a dismissal and confinement for forty-two months.

The case is before the court for review pursuant to Article 66, UCMJ. Appellant raises six assignments of error. For the reasons that follow, we affirm the findings and sentence.[4]

## I. BACKGROUND

In December 2014, Private (PV2) AT was a nineteen-year-old soldier assigned to Fort Bliss, Texas as a medic. On 6 December 2014, she accompanied Specialist (SPC) Ethan Cox to a military ball held at a hotel in downtown El Paso. Private AT was not in uniform, but rather wore a long black dress. Before she left for the ball, PV2 AT drank whiskey with Hi-C and inserted a tampon into her vagina.

At the ball, PV2 AT drank several mixed drinks and a few cups of the "grog," which contained alcohol. After the ball ended, she and SPC Cox walked to a nearby bar called The Garden, where PV2 AT continued to drink alcohol. Sometime after arriving at the bar, PV2 AT met appellant for the first time and began talking with him and First Lieutenant (1LT) Tri Nguyen. Feeling slighted, SPC Cox left PV2 AT at the bar even though he still had her purse, phone, and ID. Although PV2 AT testified that she was very drunk before she arrived at the bar, witnesses gave varied opinions about her level of intoxication over the course of the evening. Around 0200, appellant, PV2 AT, and 1LT Nguyen took an Uber to 1LT Nguyen's apartment.

---

(. . . continued)
possible prejudice. *See United States v. Taft*, 21 U.S.C.M.A. 68, 70, 44 C.M.R. 122, 124 (1971); *United States v. Franklin*, 68 M.J. 603, 604 (Army Ct. Crim. App. 2010).

[3] The specification of which the panel convicted appellant alleged that appellant committed a sexual act on a victim who was incapable of consent due to alcohol impairment. *Manual for Courts-Martial, United States* (2012 ed.) [*MCM*], pt. IV, ¶ 45.a.(b)(3)(A). The panel acquitted appellant of the second specification, which alleged in the alternative that he committed a sexual act by causing bodily harm. *MCM*, pt. IV, ¶ 45.a.(b)(1)(B).

[4] We have also given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

Private AT testified that the first thing she remembered after walking to The Garden was waking up in a strange apartment with appellant standing a foot in front of her. Although PV2 AT could not remember any specific details, she believed that both appellant and 1LT Nguyen sexually assaulted her. Private AT also remembered attacking 1LT Nguyen as he tried to get her to leave the apartment in an Uber. Once she got into the Uber, PV2 AT cried during the ride to the Fort Bliss Welcome Center and told the driver she had been raped.

Because she did not have her military ID, PV2 AT called her unit when she arrived at the Welcome Center. Sergeant First Class (SFC) Macias was dispatched to pick her up. Once she returned to the barracks, PV2 AT called Sergeant (SGT) Hine, a trusted noncommissioned officer who was PV2 AT's first-line supervisor. Sergeant Hine immediately went to PV2 AT's barracks room, where PV2 AT began to cry again and stated that she had been assaulted. Shortly thereafter, SGT Hine took PV2 AT to the emergency room at William Beaumont Medical Center (WMBC) for a sexual assault forensic examination (SAFE). Due to her intoxication level, PV2 AT was required to wait several hours before she was able to consent to the SAFE.

During the SAFE, PV2 AT explained that she was vaginally penetrated by two strangers. The nurse found and removed a tampon that was pressed against PV2 AT's cervix. Appellant's DNA was found in a DNA mixture taken from PV2 AT's pubic mound, and he could not be excluded from the male-only DNA profile found on the tampon. With respect to the DNA taken from PV2 AT's pubic mound, the government's expert concluded that it was 55 million times more likely to have originated from PV2 AT and appellant than from PV2 AT and an unknown individual. As to the tampon, the government's expert concluded based on a partial male profile that neither appellant nor his male relatives could be excluded as the source of the DNA. More specifically, the expert testified that the probability of randomly selecting a male individual with that profile from the same population as appellant was 1 in 610 Hispanic individuals. The same expert testified that the DNA found on the tampon was put there "within a few hours" before it was collected. On the other hand, both the government and defense experts confirmed that there was no semen on the tampon.

Based on her blood-alcohol level at 1145 on the morning after the ball, a forensic toxicologist testified that PV2 AT's blood-alcohol level at 0330 that morning was likely somewhere between .175 and .208 percent. On cross-examination, the toxicologist testified that it was possible for someone with that level of intoxication to consent to sex and not remember it due to being in a "black out" state.

Finally, the government called two of appellant's friends who spoke with him about the incident. Appellant told the first friend that he had "sex consensually"

with PV2 AT, and the second that they were "hooking up" but that he "couldn't get it up."

## II. LAW AND DISCUSSION

### A. Prosecutorial Misconduct and Motion to Abate

Appellant first alleges that the military judge erred in not dismissing his case with prejudice based on prosecutorial misconduct. Related to this claim, appellant also asserts that the military judge erred in denying his motion to abate the proceedings when the convening authority failed to grant 1LT Nguyen immunity to testify at his trial.

### 1. Additional Facts

Like appellant, 1LT Nguyen was charged with sexually assaulting PV2 AT. First Lieutenant Nguyen's court-marital took place in October of 2017, more than a year before appellant went to trial. At his trial, 1LT Nguyen testified that PV2 AT did not appear overly intoxicated at the bar, carried on coherent conversations, and was not stumbling, swaying, or slurring her words. While at the bar, 1LT Nguyen also observed PV2 AT showing appellant her thong and cupping his groin. First Lieutenant Nguyen further explained that PV2 AT was completely coherent when they left The Garden and asked to go to the apartment with him and appellant.

First Lieutenant Nguyen denied having any sexual interaction with PV2 AT. He testified that shortly after arriving at his apartment on the night in question, he got sick and left appellant and PV2 AT alone for about twenty minutes while he vomited and cleaned himself up. When he returned to the living room, 1LT Nguyen observed appellant and PV2 AT engaged in consensual sex. Specifically, 1LT Nguyen testified that PV2 AT had her arms and legs wrapped around appellant and was moaning with pleasure. At that point 1LT Nguyen returned to his bedroom, shut his bedroom door, and went to sleep. A short while later he awoke to PV2 AT hysterically screaming at appellant. After unsuccessfully attempting to get an explanation from PV2 AT about what happened and why she was upset, 1LT Nguyen was able to get her to input her address into his Uber application. She tried to push him down the stairs and then threw her shoes at him outside, but 1LT Nguyen was ultimately able to get PV2 AT into the Uber.

At some point after 1LT Nguyen was acquitted, appellant's trial defense counsel informed the Special Victim Prosecutor (SVP) that she believed 1LT Nguyen had lied at his trial and that appellant would be willing to testify against him if the government charged 1LT Nguyen with perjury. Several months later, on 24 May 2018, the SVP contacted 1LT Nguyen's civilian defense counsel, Ernesto Gapasin, to discuss the possibility of 1LT Nguyen testifying against appellant.

During the same conversation, the SVP also informed Mr. Gapasin that appellant was offering to testify against 1LT Nguyen if perjury charges were filed. In a summary email drafted several months later, the SVP stated that he believed he also told Mr. Gapasin that "the Government did not intend to enter into any sort of agreement with [appellant] as originally offered."

On 25 May 2018, another SVP sent an email to Mr. Gapasin informing him that appellant's trial defense counsel had raised the possibility of an immunity deal for appellant "if he were to testify truthfully against your client in perjury." The email continued, "[t]his, along with other things, leads us to believe your client did not tell the truth in his own court martial." The SVP also stated that, while the government was not inclined to grant appellant immunity, "we wanted to let you know about this and to engage your client on his willingness to testify truthfully with an immunity grant against [appellant]."

In July 2018, both Mr. Gapasin and 1LT Nguyen's trial defense counsel informed the government that 1LT Nguyen would not provide any interviews. After further email communications about potential immunity, the SVP informed Mr. Gapasin on 23 July that the government did not yet have a proposed immunity agreement. The SVP also reiterated that she did not "see any charges to pursue" against 1LT Nguyen, but still wanted to interview him. Mr. Gapasin responded, "[w]hen I last spoke with the last SVP [ ], the Govt wanted to pursue perjury charges against LT Nguyen because they lost their case. Is there some benefit to LT Nguyen to interview with you now?" Finally, Mr. Gapasin asked if there were any questions the government planned to ask that were different from those posed during 1LT Nguyen's trial.

More emails were exchanged. On 27 July 2018, trial counsel emailed Mr. Gapasin that the government's line of questioning would follow "the transcript from your client's case, under an assumption of the testimony as fact." Trial counsel further stated that "we hoped to discuss" the following topics: 1LT Nguyen's conversations with appellant; a detailed description of the interaction he observed between [PV2] AT and appellant; information re appellant's girlfriends at the time; information re appellant's typical interactions with women at bars; a further description of appellant's actions after the alleged assault; and more information on the layout of the apartment." Trial counsel concluded the email by noting that if 1LT Nguyen testified consistent with his trial testimony, the government did not see any need for immunity.

In an email dated 10 August 2018, the SVP reiterated to Mr. Gapasin that the government was not threatening or trying to intimidate 1LT Nguyen, but simply wanted to talk to him about the facts of the case and his testimony. On 14 August, Mr. Gapasin responded that his client would "neither interview nor testify without BOTH state and federal immunity." When subsequently asked for a proffer of 1LT

5

Nguyen's testimony, Mr. Gapasin responded that "1LT Nguyen will testify consistently with his trial testimony, [and] he can also testify to many of the issues you outlined in your previous email to me re matters you intend to elicit at trial."

On 15 August 2018, *appellant's* trial defense counsel asked the convening authority to grant 1LT Nguyen federal testimonial immunity and asked the government to coordinate with the local district attorney's office to obtain state immunity for 1LT Nguyen. On the same day, the defense filed a motion to abate the proceedings under Rule for Court-Martial (R.C.M.) 704(e). The next day, on 16 August, the convening authority denied appellant's trial defense counsel's request for testimonial immunity for 1LT Nguyen. At an Article 39(a), UCMJ, hearing held on 20 August, the military judge found that the government's actions with respect to 1LT Nguyen constituted "overreach" and urged the government to present the defense's immunity request to the convening authority for a second time. Given that she was continuing the trial for other reasons, however, the military judge did not abate the proceedings. The government subsequently presented appellant's trial defense counsel's request for immunity for 1LT Nguyen to the convening authority once again, but the convening authority denied it on 30 August.

In a written ruling dated 4 January 2019, the military judge found on reconsideration that the government's actions did not constitute "overreach" and that 1LT Nguyen's former trial testimony was sufficient. On the same day the military judge also denied a defense motion to dismiss for prosecutorial misconduct.

Even before the convening authority denied the second request for testimonial immunity, the government had already agreed to admit 1LT Nguyen's prior testimony at appellant's court-martial. During appellant's trial, the parties informed the military judge that they were close to paring down the relevant portions of 1LT Nguyen's testimony into a stipulation of expected testimony. At the request of the defense, the military judge confirmed that she would allow a transcript of the stipulated testimony to go back with the panel during deliberations. Ultimately, however, defense counsel made the strategic decision not to introduce any of 1LT Nguyen's testimony at appellant's trial.

### 2. *Discussion: Prosecutorial Misconduct*

Although we review the trial court's findings of fact under a clearly erroneous standard, the question of whether those facts constitute prosecutorial misconduct is subject to de novo review. *United States v. Argo*, 46 M.J. 454, 457 (C.A.A.F. 1997) (citing *United States v. Meek*, 44 M.J. 1, 5–6 (C.A.A.F. 1996)).

Our superior court has defined prosecutorial misconduct as "action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable ethics canon." *Meek*, 44 M.J. at

5 (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). Among other things, trial counsel in *Meek* told a defense witness that he should be afraid to come to the trial because he would be court-martialed himself. *Id.* at 2. Addressing this issue, the Court of Appeals for the Armed Forces (CAAF) held that "[s]everal legal norms are violated when a trial counsel attempts to or unlawfully dissuades a defense witness from testifying at a court-martial," and that such conduct "can frustrate an accused's right to compulsory process under the Sixth Amendment even if done under the guise of advising the defense witness of his constitutional rights." *Id.* at 5–6.

In *United States v. Edmond*, 63 M.J. 343, 346 (C.A.A.F. 2006), the defense subpoenaed a civilian witness to testify favorably for the accused. When the witness arrived at the courthouse to testify, trial counsel first met with him and, after hearing his proffered testimony, informed the witness that he believed he was lying and would commit perjury if he testified. *Id.* During this same meeting, trial counsel called in a Special Assistant United States Attorney to let the witness "know what the potential repercussions would be for committing perjury," and to put him on notice that the "government would seek justice" even though he was a civilian. *Id.* at 347. After the witness agreed not to testify, trial counsel excused him (even though he was under a defense subpoena) and subsequently informed defense counsel that the witness would be invoking his Fifth Amendment rights. *Id.*

In the instant case, appellant focuses on the initial email between the SVP and Mr. Gapasin and argues that the prosecutors' conduct in this case is akin to that in *Edmond*. Given the representation that appellant was offering to testify against 1LT Nguyen for allegedly committing perjury, the SVP's further averment that "[t]his, along with other things, leads us to believe your client did not tell the truth in his own court martial," is somewhat problematic. On the whole, however, we find that unlike trial counsel in both *Meek* and *Edmond*, the prosecutors in this case neither attempted to dissuade nor actually dissuaded 1LT Nguyen from testifying at appellant's trial. Indeed, even in her original email the SVP concluded by saying that the government was not inclined to take the offer and was still interested in having 1LT Nguyen testify at appellant's trial. Further, the government continued to work with ILT Nguyen's counsel over the next few months to devise a way for him to testify. Among other things, the SVP and trial counsel emphasized that the government did "not see any charges to pursue" against 1LT Nguyen, and was "not threatening or trying to intimidate" him. Although the discussion went back and forth regarding potential immunity, the government correctly reiterated on several occasions that there was no need for immunity if, as represented by counsel, 1LT Nguyen planned on testifying consistent with his prior trial testimony.[5]

---

[5] Given that the only evidence in the record is that any testimony provided by 1LT Nguyen in appellant's trial would be consistent with his own trial testimony, we

(continued . . .)

Although in hindsight the SVP might have used different language in her first email, on balance we find that the government's efforts focused on attempting to secure, rather than prevent, 1LT Nguyen's testimony. Without more, the fact that the convening authority ultimately rejected both of appellant's requests for testimonial immunity for 1LT Nguyen does not establish that trial counsel committed prosecutorial misconduct.

### 3. *Discussion: Motion to Abate*

Rule for Courts-Martial 704(e) authorizes a military judge to direct that "either an appropriate convening authority grant testimonial immunity to a defense witness or, as to the affected charges and specifications, the proceedings against the accused be abated." Before making such an order, the military judge must find that: (1) the witness intends to invoke the right against self-incrimination; (2) the government has either engaged in discriminatory use of immunity to gain a tactical advantage, or, through overreaching, has forced the witness to invoke the privilege; and (3) the witness' testimony is material, exculpatory, not cumulative, not obtainable from any other source, and does more than merely affect the credibility of other witnesses. *Id.* We review a military judge's ruling on a motion to abate for abuse of discretion. *United States v. Ivey*, 55 M.J. 251, 256 (C.A.A.F. 2001).

We have previously held that R.C.M. 704(e) places "a very heavy burden on the defense" to meet all three elements of the test. *United States v. Ivey*, 53 M.J. 685, 693 (Army Ct. Crim. App. 2000), *aff'd* 55 M.J. 251 (C.A.A.F. 2001) (citing *United States v. Richter*, 51 M.J. 213, 223 (C.A.A.F. 1999)). As to the first prong, there is no dispute that 1LT Nguyen intended to invoke his right against self-incrimination. As to the second prong, while we agree with the military judge that the defense need not show prosecutorial misconduct in order to demonstrate "overreach," for all of the reasons set forth immediately above, the government did not engage in the discriminatory use of immunity or otherwise force the witness to invoke.

As to the third prong, the military judge found that although 1LT Nguyen's testimony was material, exculpatory, and not cumulative, it was still available to the defense via his trial testimony transcript. Appellant now argues that the transcript was not an "adequate substitute" for 1LT Nguyen's live testimony because his counsel did not have the opportunity to cross-examine in the first proceeding. While

---

(. . . continued)
need not address the viability of "perjury immunity." *See United States v. DeSalvo*, 26 F.3d 1216, 1222 (3d Cir. 1994) ("[T]he government may not use a witness's immunized testimony in a prosecution for committing perjury in a prior proceeding.").

this may be true, the rule requires only that the testimony be "obtainable from *any* other source," not that it be in the format most favorable to the defense. R.C.M. 704(e)(3) (emphasis added). As such, and given that the government stipulated to the admissibility of 1LT Nguyen's trial testimony, the military judge did not abuse her discretion in ruling that the defense did not satisfy the third prong. In any event, defense counsel's ultimate decision not to introduce any of 1LT Nguyen's testimony in appellant's court-martial significantly undermines his current claim that 1LT Nguyen's testimony "was crucial to appellant's case," and "could have provided the very evidence needed to convince the panel of appellant's innocence."[6]

Appellant also asserts that, because Mr. Gapasin represented that 1LT Nguyen would also be able to testify to "many" of the other issues identified in trial counsel's 27 July 2018 email, this was new testimony not available from any other source. In *Ivey*, however, we held that the defense bears the burden to demonstrate that the excluded testimony would be both material and exculpatory. 53 M.J. at 694. In his briefing before this court, appellant does not address these elements at all, but rather asserts only that "LT N was willing to provide more answers to more questions if asked." In the proceedings below, defense counsel initially asserted that she could "elicit facts that are stronger exculpatory evidence than what was developed" and "other details that show more exculpatory evidence for our client for sure." In a subsequent hearing, defense counsel stated she wanted to ask 1LT Nguyen questions about how often the victim was moved, what her exact weight and position were, and in general elicit "more substance and more details and more information." With respect to the "other" issues 1LT Nguyen might have testified about, the defense proffers did not provide "sufficient detail for the reviewing judge to determine if the testimony was material, exculpatory, and not cumulative." *Ivey*, 53 M.J. at 694 (citing *United States v. Alston*, 33 M.J. 374–75 (C.M.A. 1991) for the proposition that the defense proffer lacked specifics that would be exculpatory).

As such, for all of the reasons set forth above, the military judge did not abuse her discretion in denying appellant's motion to abate the proceedings.

---

[6] Although one might question this choice in hindsight, "[c]ounsel are presumed competent," and appellant does not argue ineffective assistance of counsel. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001). Given that her closing argument focused in part on the government's failure to prove penile penetration, it is understandable why the defense would not want to elicit testimony from 1LT Nguyen that appellant and PV2 AT were having consensual intercourse. *See Harrington v. Richter*, 562 U.S. 86, 109 (2011) (finding no ineffective assistance of counsel and noting that "[a]fter an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better").

### B. *Motion to Dismiss for Failure to State an Offense*

### *1. Additional Facts*

The panel found appellant guilty of Specification 1 of The Charge, which alleged, in pertinent part:

> In that [appellant], . . . did, . . . on or about 7 December 2014, . . . commit a sexual act upon [PV2 AT], by causing penetration of [PV2 AT's] vulva with a part of [appellant's] body, when [PV2 AT] was incapable of consenting to the sexual act because she was impaired by an intoxicant, to wit: alcohol, a condition that was known or reasonably should have been known by [appellant].

In response to a Bill of Particulars requesting clarification of its charging theory, the government stated the specification was charged under Article 120(b)(3)(A), UCMJ (sexual act when incapable of consenting due to impairment by drug or alcohol). The government also averred that the "sexual act" was as defined in Article 120(g)(1)(B), UCMJ, "where the part of the accused's body used to penetrate the vulva is not relevant so long as the penetration occurred with the intent to 'abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person.'"

The defense did not contest the Bill of Particulars response or otherwise challenge the specification until the military judge raised the issue sua sponte after the government rested at trial. Once the panel was excused for the evening, the military judge referred to the flyer and told the government, "I presume you know that if it's a body part other than a penis, you have a problem," because the specification was missing the element of intent to abuse, harass, or humiliate, or to arouse or gratify sexual desire. In the military judge's opinion, the only way the specification could state an offense was if it was limited to penile penetration, which she compared to "narrowing a date range." At that point the defense notified the court and counsel they had a motion to dismiss for failure to state an offense ready for filing, which led to a further exchange with the military judge. Although defense counsel generally asserted that the defense did not have sufficient notice of the charge, her argument focused primarily on double jeopardy concerns.

In the written motion to dismiss, the defense acknowledged that, contrary to what the military judge stated, the government was not required to allege the Article 120(g)(1)(B), UCMJ, intent element. Nevertheless, the defense claimed that the specification unfairly required speculation about the body part appellant used and what his specific intent was (i.e., to humiliate, gratify, etc.). As defense counsel did in the initial colloquy with the military judge, the defense again asserted that the use

of the term "body part" without more raised double jeopardy concerns. Finally, the defense disavowed any reliance on the Bill of Particulars response, arguing instead that the response failed to correct the deficiencies or provide proper notice.

The next morning, the military judge ruled that if the government intended to allege sexual acts by a body part other than a penis, the specification was deficient because it lacked the intent element. Although she denied the motion to dismiss, the military judge informed the government that she was going to make them "prove what you have pled, exactly what you have pled." Moreover, the military judge ruled that she was going to instruct the members they needed to find "beyond a reasonable doubt that the penetration was by a penis."

## 2. Discussion

Whether a specification fails to state an offense is a question of law which we review de novo. *United States v. Turner*, 79 M.J. 401, 403 (C.A.A.F. 2020). As the CAAF explained in *United States v. Fosler*, because the military is a notice pleading jurisdiction, a charge and specification will be found sufficient if they "first, contain the elements of the offense charged and fairly inform a defendant of the charge against which he must defend, and, second enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense." 70 M.J. 225, 229 (C.A.A.F. 2011) (citations omitted). "A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication." *Id.* (quoting R.C.M. 307(c)(3)).

In this case, Specification 1 of The Charge alleged sexual assault in violation of Article 120(b)(3)(A), UCMJ, which requires the government to prove that the accused committed a *sexual act* upon another person when the other person is incapable of consenting to the sexual act due to impairment by any drug, intoxicant, or other similar substance, and that condition is known or reasonably should be known by the accused. *MCM*, pt. IV, ¶ 45.a.(b)(3)(A) (emphasis added). Article 120(g)(1), UCMJ, defines "sexual act" as "(A) contact between the penis and the vulva, anus, or mouth;" or "(B) the penetration, however slight, of the vulva or anus or mouth of another by any part of the body or by any object, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person." *Id.* at ¶ 45.a.(g)(1)(A)–(B).

While we agree with the military judge's denial of the motion to dismiss on a general level, we reject both her rationale and the limitations of her ruling. We addressed a related issue in *United States v. Robertson*, ARMY 20170022, 2018 CCA LEXIS 92, at *2 (Army Ct. Crim. App. 26 Feb. 2018) (summ. disp.), involving a challenge to an abusive sexual contact specification on the grounds that it failed to allege or distinguish whether the appellant intended to abuse, humiliate, or degrade any person or instead intended to arouse or gratify the sexual desire of any person.

Notwithstanding that there are "several different subjective intents that are all part of the definition of 'sexual contact,'" we concluded that the specification's general use of the term "sexual contact" provided sufficient notice to the appellant. *Id.* at *5–6 (citing *Fosler*, 70 M.J. at 229).

In further support of our holding in *Robertson*, we cited to *United States v. Winston*, 2014 CCA LEXIS 757, at *9 (A.F. Ct. Crim. App. 8 Oct. 2014), which in turn cited favorably to *United States v. Alston*, 69 M.J. 214, 216 (C.A.A.F. 2010). In *Winston*, our sister court discussed the CAAF's holding in *Alston*, stating:

> Despite the fact that this statutory definition of sexual act contained two disjunctive factual predicates *and* the two specific intent alternatives at issue in this case, the *Alston* court did not find either of those statutory alternatives were elements in the sense of providing notice to the accused of the allegations he was required to defend against.

2014 CCA LEXIS 757 at *8–9; *see also United States v. Hohenstein*, 2014 CCA LEXIS 179 at *19 (A.F. Ct. Crim. App. 20 Mar. 2014), *aff'd in part, rev'd in part on other grounds*, 73 M.J. 473 (C.A.A.F. 2014) (stating that given the statutory definitions of sexual act and sexual contact, the phrases "sexual act" and "sexual contact" are sufficiently definite in legal meaning to put the appellant on notice of the charges against him); *United States v. Haugen*, ARMY 20180375, 2019 CCA LEXIS 412 at *8–9 (Army Ct. Crim. App. 25 Oct. 2019) (mem. op.) (noting that although the specifications did not expressly include the definition of lewd act, the statutory definition of that term put appellant on sufficient notice); *United States v. Baker*, ARMY 20170438, 2019 CCA LEXIS 165 (Army Ct. Crim. App. 10 Apr. 2019) (summ. disp.) (rejecting challenge to specification which alleged non-penile penetration without any specific intent because the term sexual act and its statutory definition provided adequate notice).

While we recognize that none of the cases cited above are directly on point, on balance we agree with their reasoning and logic and find them to be dispositive here. As such, the military judge erred when she ruled that Specification 1 of The Charge was deficient because it failed to set forth the required specific intent. To the contrary, because it alleged the commission of a "sexual act," the specification: (1) set forth the elements of the offense; (2) provided sufficient notice to the accused; and (3) alleged sufficient facts to protect against re-prosecution. *United States v. Sell*, 3 U.S.C.M.A. 202, 206, 11 C.M.R. 202, 206 (1953); *Fosler*, 70 M.J. at

229 (noting a specification is sufficient if it alleges every element expressly or by "necessary implication").[7]

The fact that the military judge's reasoning was incorrect does not, however, end the analysis. In *United States v. Bryant*, we held that it is "not enough to merely object; the appellant must go further and in stating the reasons for his objection he must show he has been prejudiced and why he should be entitled to relief." 28 M.J. 504, 505 (A.C.M.R. 1989); *see also United States v Humphries*, 71 M.J. 209, 215, 217 n.10 (C.A.A.F. 2012) (defective specification constitutes harmless error unless appellant can show material prejudice to his substantial right to notice). As discussed above, the correct ruling would have allowed the government to proceed on its dual-track penile penetration and non-penile specific intent theories. Instead, the military judge's ruling, issued *after* the government rested, inured entirely to appellant's benefit by substantially limiting the scope of the charged offense and the government's ability to prove its case.

Indeed, at no point, either at trial or on appeal, has appellant set forth how he was specifically prejudiced or limited in his ability to cross-examine witnesses or otherwise defend against the specification as limited by the military judge. To the contrary, defense counsel took advantage of the ruling by arguing in her closing that the government failed to prove that there was any penile penetration. *See United States v. Crafter*, 64 M.J. 209, 212 (C.A.A.F. 2006) (finding the appellant was on notice in part because the defense counsel argued in closing that there was insufficient evidence to support the element at issue). Likewise, appellant has never specifically addressed how the military judge's ruling in any way limited or impacted his ability to present his case-in-chief. Nor did the defense ask to recall any of the government's witnesses after the military judge's limiting ruling.

In summary, although the military judge provided an incorrect rationale for denying the motion to dismiss for failure to state an offense, appellant is entitled to no relief.

---

[7] Alternatively, even if the specification was deficient in failing to allege specific intent, the military judge cured any such error by limiting the government's theory only to penile penetration. *See United States v. Watkins*, 2019 CCA LEXIS 71 at *45 (N.M. Ct. Crim. App. 2019), *rev'd on other grounds* 2020 CAAF LEXIS 496 (C.A.A.F. 2 Sept. 2020) ("[T]he specification and the military judge's description of the elements sufficiently narrowed the scope of conduct for which the members could have convicted appellant.").

*C. Factual and Legal Sufficiency*

*1. Factual Sufficiency*

In pertinent part, Article 66, UCMJ, provides that this court may "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact." In doing so, we are required to undertake a de novo "fresh, impartial look at the evidence," and need not defer to the findings of the trial court. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

Article 66, UCMJ, also mandates, however, that in conducting such an assessment, we must recognize "that the trial court saw and heard the witnesses." As such, the test for factual sufficiency is "whether, after weighing the evidence in the record of trial and *making allowances for not having personally observed the witnesses*," we are "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) (emphasis added). Moreover, as we recently reiterated, on a more general level the expansive authority given to this court under Article 66, UCMJ, should serve as a "safety valve of last resort." *United States v. Ross,* ARMY 20190537, 2020 CCA LEXIS 353 at *11–12 (Army Ct. Crim. App. 30 Sept. 2020) (quoting *United States v. Conley*, 78 M.J. 747, 752 (Army Ct. Crim. App. 2019)). As explained below, the facts of this case do not require us to exercise our "proverbial 800-pound gorilla" Article 66, UCMJ, discretion to find factual insufficiency in this case. *United States v. Parker*, 32 M.J. 269, 271 (C.M.A. 1993).

Appellant's contention that there is insufficient evidence of penile penetration is belied by the fact that his DNA was found on PV2 AT's pubic mound and the tampon which was pressed against her cervix. Among other things, the SAFE nurse who located the tampon did not believe that a finger could have pushed it that far into the vaginal canal. Likewise, the government's expert opined that the DNA found on the tampon was put there "within a few hours" before it was collected. Finally, one of appellant's friends testified that appellant told him he had consensual sex with PV2 AT.

As to whether the government proved that PV2 AT was too intoxicated to consent and that appellant knew or reasonably should have known she was incapable of consenting, PV2 AT herself testified that she was too drunk to consent or remember any of the specifics of the assault. In addition, a number of other witnesses, including both of the Uber drivers, described her as exhibiting clear signs of impairment. Likewise, the toxicologist estimated PV2 AT's blood-alcohol level at 0330 to be somewhere in the range of .175 to .208 percent, and the SAFE nurse testified that PV2 AT was too intoxicated to consent to the exam when she first arrived at the emergency room. As such, we agree with and affirm the panel's findings as factually sufficient.

14

### 2. Legal Sufficiency

We also review questions of legal sufficiency de novo. *Washington*, 57 M.J. at 399. In conducting this review, "the relevant question an appellate court must consider is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (emphasis in original) (internal quotation marks omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Such a limited inquiry reflects our intent to give full play to *the responsibility of the trier of fact* fairly to resolve conflicts in the testimony, to weigh the evidence, *and to draw reasonable inferences* from basic facts to ultimate facts." *United States v. Pablon*, 42 M.J. 404, 405 (C.A.A.F. 1995) (emphasis in original) (internal quotation marks omitted) (quoting *United States v. Hart*, 25 M.J. 143, 146 (C.M.A. 1987)).

Given the relatively low threshold for establishing legal sufficiency, and for all of the reasons discussed above, a reasonable factfinder could have found all of the essential elements of the sexual assault offense at issue beyond a reasonable doubt. Accordingly, we affirm the findings as legally sufficient.

### D. Excited Utterance

### 1. Additional Facts

Private AT testified that when she left the apartment she was very angry, "trying to survive, just trying to react and get out of there," and "hysterically crying and screaming at the same time." She also remembered crying a lot on the ride back to Fort Bliss and telling the Uber driver that she was raped. The Uber driver who drove her to the Welcome Center likewise testified that PV2 AT was crying and told him about the assault.

After arriving at the Welcome Center without her ID, PV2 AT had to call her unit to get on post. She testified that she cried and still felt "traumatized" when SFC Macias transported her to her barracks. Defense counsel did not object when SGT Hine testified that SFC Macias subsequently told her that PV2 AT seemed "really sloppy and out of it," and that he could "tell something was off, but he didn't want to pry."

When she got back to her room, PV2 AT called SGT Hine because she "just knew that she was the person that I needed to call." Sergeant Hine likewise testified that PV2 AT called around 0500 "crying and upset and at first I couldn't make out what she was trying to say because she was so overwhelmed with tears." Sergeant Hine left right away for the barracks, and after entering into the room, immediately observed PV2 AT run straight to the bed crying and "panicked." Sergeant Hine

15

hugged PV2 AT, letting her cry for a minute before asking what was wrong and what happened. Sergeant Hine also testified with no objection that, after PV2 AT responded (without getting into specifics), she told PV2 AT about "restricted and unrestricted reporting" and the option to go to the hospital or get counseling.

When trial counsel asked SGT Hine to tell the panel specifically what PV2 AT told her, the military judge initially sustained the defense hearsay objection. After further questioning elicited that SGT Hine arrived at the barracks between 0520 and 0530 to find PV2 AT "still very overwhelmed, and very, very upset," the military judge overruled the defense objection on excited utterance grounds. Sergeant Hine then testified that PV2 AT told her she was raped.

Finally, the SAFE nurse testified without objection that PV2 AT told her two men had assaulted her in an apartment. Likewise, at no point did the defense challenge or object to the admission of the written exam results indicating that PV2 AT "was sexually assaulted by two different males" and "vaginally penetrated by two strangers."

*2. Discussion*

Appellant argues that the military judge erred in admitting SGT Hine's testimony about PV2 AT's statement that she was raped. We review a military judge's decision to admit evidence as an excited utterance for an abuse of discretion. *United States v. Moonlick*, 53 M.J. 174, 176 (C.A.A.F. 2000). The abuse of discretion standard is deferential, predicating reversal on more than a mere difference of opinion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015); *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) ("[T]he abuse of discretion standard of review recognizes that a judge has a wide range of choices and will not be reversed so long as the decision remains within that range.") (citation omitted).

Military Rule of Evidence [Mil. R. Evid.] 803(2) provides that a "statement relating to a startling event or condition, made while the declarant was under the stress of the excitement that it caused," is not hearsay. A statement must meet three requirements to qualify as an excited utterance: (1) it must be spontaneous, excited, or impulsive rather than the product of reflection and deliberation; (2) the event prompting the utterance must be startling; and (3) the declarant must be under the stress of the excitement caused by the event. *United States v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987).

Appellant concedes that if PV2 AT was sexually assaulted the second prong is satisfied. He contends, however, that PV2 AT's statement to SGT Hine was both "a product of reflection and deliberation" and too far removed from the startling event. We disagree. Our superior court in *Arnold* explained that although relevant, the lapse of time between the startling event and out-of-court statement is not

dispositive in the application of Mil. R. Evid. 803(2). *Id.* In *United States v. Feltham*, the CAAF similarly held that even though the victim waited an hour to tell his roommate he had been sexually assaulted, his statement qualified as an excited utterance because he was not thinking clearly and was crying. 58 M.J. 470, 474 (C.A.A.F. 2003).

Appellant places significant weight on the fact that PV2 AT's statement came in response to SGT Hine's question. Appellant does not cite to, nor are we aware of, any authority holding that a statement made in response to a question cannot per se qualify as an excited utterance. To the contrary, in *United States v. Donaldson*, the CAAF noted that courts look to a *number of factors* in determining whether a declarant is still under the stress of a startling event at the time of his or her statement, to include: "the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement." 58 M.J. 477, 483 (C.A.A.F. 2003) (quoting *Reed v. Thalacker*, 198 F.3d 1058, 1061 (8th Cir. 1999)); *see also United States v. Pearson*, 33 M.J. 913, 915 (A.F.C.M.R. 1991) (noting that just because the declaration came in response to questioning was not a barrier to its admissibility because the trustworthiness of the statement was the most important consideration).

It is not surprising that, after holding the crying PV2 AT for a minute or so in an attempt to comfort her, SGT Hine asked "what's wrong?" Indeed, given PV2 AT's physical and mental condition as well as the nature of the triggering event, the fact that SGT Hine asked her a simple open-ended question does not mean that PV2 AT's response was necessarily the "product of reflection and deliberation." *Arnold*, 25 M.J. at 132. To the contrary, PV2 AT was crying on the Uber ride back to post and was "really sloppy and out of it" when transported from the Welcome Center to her barracks room. Likewise, based on SGT Hine's uncontroverted testimony, PV2 AT was still "overwhelmed" and "panicked" when SGT Hine arrived at her barracks room. In short, there is no evidence that PV2 AT ever "decompressed" or had the opportunity to rationally reflect and gather her thoughts before she responded to SGT Hine's question.

The cases cited by appellant are easily distinguishable. In *United States v. Jones*, although the court was critical of a statement made in response to a question, that question related to an event twelve hours earlier, during which time the declarant "had gone about her daily business." 30 M.J. 127, 129 (C.A.A.F. 1990). In *United States v. Johnson*, a video captured the declarant appearing calm and composed while walking to and from the shower before she made her statement, and the declarant herself testified that prior to making the statement she had already started reflecting upon what happened. ARMY 20180527, 2020 CCA LEXIS 249 at *3, *6–7 (Army Ct. Crim. App. 23 Jul. 2020) (mem. op.). Finally, in *United States*

*v. Henry*, because there was insufficient evidence as to both when the alleged assault occurred and that the declarants made the proffered statements during or immediately after the alleged event, the government failed to lay a sufficient foundation to admit the statements as excited utterances. ARMY MISC 20190688, 2020 CCA LEXIS 195 at *4–5 (Army Ct. Crim. App. 3 Jun. 2020) (mem. op.), *cert. for rev. filed* No. 20-0342/AR (C.A.A.F. 3 Aug. 2020) (argued 28 Oct. 2020).

In conclusion, we find on the record before us that the military judge did not abuse her discretion by admitting PV2 AT's response as an excited utterance. *See Feltham*, 58 M.J. at 475 ("The critical determination is whether the declarant was under the stress or excitement caused by the startling event.").

Alternatively, even if the military judge erred, we conclude appellant suffered no prejudice. For preserved nonconstitutional evidentiary errors, "the test for prejudice is whether the error had a substantial influence on the findings." *United States v. Clark*, 79 M.J. 449, 455 (C.A.A.F. 2020) (quoting *United States v. Kohlbek*, 78 M.J. 326, 333 (C.A.A.F. 2019)). We review de novo the prejudicial effect resulting from the erroneous admission of evidence and do so by weighing: "(1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *United States v. Roberson*, 65 M.J. 43, 47–48 (C.A.A.F. 2007) (citations and internal quotation marks omitted).

For all of the reasons set forth above in our factual sufficiency review, the government had the stronger case. Moreover, and in any event, PV2 AT's statement was cumulative to: (1) the Uber driver's testimony that PV2 AT told him she was assaulted; (2) PV2 AT's testimony that she told SGT Hine that she was assaulted; (3) SGT Hine's testimony that she told PV2 AT about her "restricted and unrestricted" reporting options; (4) the SAFE nurse's testimony that PV2 AT told her she was assaulted by two men in an apartment; and (5) the SAFE result records indicating that PV2 AT "was sexually assaulted by two different males" and "vaginally penetrated by two strangers." *See United States v. Lovett*, 59 M.J. 230, 235–36 (C.A.A.F. 2004) (citing *United States v. Gunkle*, 55 M.J. 26, 30 (C.A.A.F. 2001) (noting the court's reluctance to find reversible error from the erroneous admission of hearsay evidence when the challenged information is cumulative)). As such, even if erroneously admitted, we conclude the admission of PV2 AT's statement to SGT Hine did not substantially influence the findings.

18

*E. Post-Trial Delay*

*1. Additional Facts*

On 22 January 2019, five days after the court-martial concluded, the defense filed a motion to dismiss for lack of jurisdiction. The government filed its response on 28 January 2019, and the military judge issued her written ruling denying the motion on 8 March 2019.

After receiving the authentication of the record of trial (ROT) on 13 May 2019, which included a transcript of 1,131 pages, defense counsel completed his review on 30 May 2019. Although the military judge received the transcript on 6 June 2019, she returned it for corrections and did not obtain a revised copy until 11 July 2019. The military judge then completed her authentication on 18 July 2019. On both 7 May and 27 June 2019, appellant asserted his right to speedy post-trial processing.

The staff judge advocate issued his recommendation (SJAR) on 12 August 2019, and on 20 August 2019, defense counsel was served with the SJAR and ROT. After appellant received his copy of the SJAR and ROT on 7 October 2019, defense counsel requested and was granted an additional twenty days to submit post-trial matters to the convening authority. After receiving the defense's post-trial submissions on 6 November 2019, the staff judge advocate issued his SJAR addendum on 18 November 2019, and the convening authority took action the same day.

In total, the eleven-volume record of trial includes 1,131 pages of transcript, 44 prosecution exhibits, 20 defense exhibits, and 103 appellate exhibits.

*2. Discussion*

When confronted with a claim of post-trial delay, this court has two distinct responsibilities. *United States v. Simon*, 64 M.J. 205, 207 (C.A.A.F. 2006) (citing *Toohey v. United States*, 60 M.J. 100, 103–04 (C.A.A.F. 2004)). First, we review de novo whether claims of excessive post-trial delay resulted in a due process violation. *Id.* (citing U.S. Const amend. V; *Diaz v. Judge Advocate General of the Navy*, 59 M.J. 34, 38 (C.A.A.F. 2003)). Second, even if we find no error as a matter of law, we may grant an appellant relief for excessive post-trial delay using our broad authority to determine sentence appropriateness under Article 66, UCMJ. *Id.* (citing *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002)).

A presumption of unreasonable post-trial delay exists when the convening authority fails to take action within 120 days of completion of trial. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). In *Toohey*, the CAAF adopted the four-

factor balancing test from *Barker v. Wingo*, 407 U.S. 514 (1972), to determine whether the post-trial delay constitutes a due process violation, considering: "(1) length of the delay; (2) reasons for the delay; (3) the appellant's assertion of his right to a timely appeal; and (4) prejudice to the appellant." 60 M.J. at 102.

In assessing the fourth factor of prejudice, we consider three sub-factors: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Moreno*, 63 M.J. at 138–39 (quoting *Rheuark v. Shaw*, 628 F.2d 297, 303 n.8 (5th Cir. 1980)). Further explaining prejudice in this context, the CAAF in *Moreno* held that an appellant must show a particularized anxiety or concern that is distinguishable from the normal anxiety experienced while awaiting an appellate decision. *Id.* at 140. As to any alleged limitations, mere speculation is not enough, but rather "an appellant must be able to specifically identify how he would be prejudiced at rehearing due to the delay." *Id.* Finally, absent a finding of prejudice, a due process violation exists only when "the delay is so egregious that tolerating it would adversely affect the public's perception of fairness and the integrity of the military justice system." *Toohey*, 63 M.J. at 362.

Applied here, the first factor weighs in favor of appellant, as the 315 days that elapsed between the completion of trial and the convening authority's action is facially unreasonable. Under the second factor, we look at the government's responsibility for any delay, as well as any legitimate reasons for the delay, including those attributable to appellant. On balance, the second factor also weighs slightly in favor of appellant. Subtracting 45 days for the government's response and the military judge's consideration and issuance of a written ruling on appellant's post-trial motion, *see United States v. Harris*, 66 M.J. 781, 790–91 (N-M Ct. Crim. App. 2008) (noting "reasonable time" may be deducted for an appellant's post-trial motion); 18 days for defense counsel's authentication of the record; and the 20 additional days requested by the defense to submit post-trial matters, the government is still responsible for 232 days of the delay.[8] Finally, the third factor also weighs in appellant's favor as he twice demanded speedy post-trial processing.

The fourth factor, however, weighs heavily in favor of the government. Because appellant has not identified any particularized anxiety or concerns, or specifically identified how the delay would prejudice him at any rehearing, appellant has failed to demonstrate prejudice. Nor do we find that the post-trial processing

---

[8] Even if the forty-five days for the post-trial motions is unreasonable and not attributable to the defense, this would not change our analysis and ultimate conclusion.

was "so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362.

Weighing all of the above, we find no due process violation in the post-trial processing of the appellant's court-martial. Likewise, we find that the delay of 232 days to prepare an eleven-volume ROT with a transcript exceeding 1,100 pages is not so excessive that it warrants relief under Article 66, UCMJ. *See United States v. Perez*, ARMY 20180578, 2020 CCA LEXIS 180 at *4 (Army Ct. Crim. App. 28 May 2020) (summ. disp.) (concluding that 273 days to prepare a 627-page ROT does not warrant relief); *United States v. Garman*, 59 M.J. 677, 682 (Army Ct. Crim. App. 2003) ("[A] lengthy ROT requires more time to transcribe, review, and authenticate.").

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Chief Judge KRIMBILL and Senior Judge BURTON concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

21